ARTESIAN WATER COMPANY, Plaintiff,

v.

The GOVERNMENT OF NEW CASTLE COUNTY, Defendant, Third-Party Plaintiff,

v.

LANDFILL, INC., a Delaware corporation, Material Transit, Inc., a Delaware corporation, Edgar Thomas Harvey, Edgar Thomas Harvey, Jr., W. Lawrence Knotts, Henry A. Twardus, William W. Saienni, Elmer D. Saienni, Salvatore J. Saienni, Dominic Cantera, Marian Cantera, Delaware Sand and Gravel Company, a Delaware corporation, Anita Dell Aversano, individually and as Executrix of the Estate of Joseph Dell Aversano, Vincent Dell Aversano, Marcella Dell Aversano, Stauffer Chemical Co., a Delaware corporation, Haveg Industries, Inc., a Delaware corporation, Champlain Cable Corporation, a Delaware corporation, Angelo Terranova, Stanley J. Twardus & Sons, Inc., a Delaware corporation, and SCA Services, Inc., a Delaware corporation, Third-Party Defendants.

Civ. A. No. 83–854–WKS.

United States District Court, D. Delaware.

Feb. 14, 1985.

Thomas D. Whittington, Jr., Whittington & Aulgur, Wilmington, Del., E. Barclay Cale, Jr., Frank M. Thomas, Jr., Annemiek

N. Young, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiff.

B. Wilson Redfearn, Tybout, Redfearn, Casarino & Pell, Wilmington, Del., Michael A. Brown, George J. Weiner, Schmeltzer, Aptaker & Sheppard, Washington, D.C., and Robert K. Beste, Jr., Charles H. Toliver, IV, Biggs & Battaglia, Wilmington, Del., for New Castle County.

Januar D. Bove, Jr., James M. Mulligan, Jr., Jeffrey B. Bove, Connolly, Bove, Lodge & Hutz, Wilmington, Del., James F. Burger, Westport, Conn., David O. Bickart, Kaye, Scholer, Fierman, Hays & Handler, Washington, D.C., for Stauffer Chemical Co.

Paul H. Spiller, Kimmel & Spiller, Wilmington, Del., for Landfill, Inc., Material Transit, William Saienni, Elmer Saienni and Salvatore Saienni.

Charles S. Crompton, Jr., James F. Burnett, Potter, Anderson & Corroon, Wilmington, Del., for Haveg Industries, Inc. and Champlain Cable Corp.

F. Michael Parkowski, Bonnie M. Benson, Parkowski, Noble & Guerke, Dover, Del., for Delaware Sand & Gravel, and Anita Dell Aversano.

Paul S. Swierzbinski, Wilmington, Del., for Angelo Terranova.

John James Conly, Wilmington, Del., John F. Stoviak, Michael L. Krancer, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for SCA Services, Inc.

James McC. Geddes, Ashby, McKelvie & Geddes, Wilmington, Del., for E.T. Harvey.

Carl A. Agostini, Agostini & Little, Wilmington, Del., for Stanley Twardus & Sons.

## OPINION

STAPLETON, Chief Judge:

This is an action brought by Artesian Water Company ("Artesian") against New Castle County ("County") pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607, to recover costs incurred in providing alternative sources of drinking water for its customers. Artesian claims that since these costs have been and continue to be incurred as a direct result of the release or threatened release of hazardous substances from a landfill owned by the County into an acquifer used as a primary source of supply by Artesian, they are "response costs" as that term is defined by CERCLA, and therefore, properly recoverable from the County. Artesian has moved for summary judgment on the issue of liability and the County has moved to dismiss the complaint for failure to state a claim upon which relief can be granted, to strike portions of the complaint, and for relief pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. For the reasons set forth herein, the County's motion to dismiss will be granted without prejudice.

## BACKGROUND

Artesian is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Newark, Delaware. Artesian provides drinking water to approximately 130,000 residents of New Castle County, and as a water utility, is regulated by the Delaware Public Service Commission.

The sources of supply for Artesian's public water system are a series of wells located throughout its service territory of roughly 106 square miles. Historically, one of Artesian's primary sources of supply has been its Llangollen Wellfield, located approximately seven miles south of Wilmington, Delaware. The Llangollen Wellfield draws water from the Upper Potomac Aquifer, one of the most productive groundwater zones in New Castle County.[1]

Artesian began to develop its Llangollen Wellfield in 1946, and by mid-1969, it had seven wells on line with a production capacity of 4.9 million gallons per day ("MGD").

---

1. The Upper Potomac Aquifer has been a heavily developed source of groundwater since the early 1960's.

Shortly thereafter, Artesian began to replace the existing facilities and to increase the design capacity of the Llangollen Wellfield.[2] Following the construction of five replacement wells in 1971, Artesian was able to raise its average daily pumpage to 3.85 MGD and its peak withdrawals to 5.35 MGD.[3]

In 1972, the Delaware Department of Natural Resources and Environmental Control ("DNREC") informed Artesian that groundwater pollution had been discovered in the vicinity of the Llangollen Wellfield. DNREC established an acquifer monitoring program and found the most likely source of the groundwater pollution to be the Army Creek Landfill ("Site"), a landfill owned by the County and located approximately 3000 feet north-northeast of the Llangollen Wellfield. Thereafter, in 1973, DNREC directed Artesian to limit its withdrawals from the Llangollen Wellfield to 2.0 MGD, a restriction that has continued to present.

The County is a political subdivision organized and existing under the laws of the State of Delaware with its principal offices in Wilmington, Delaware. From September, 1960 to September, 1962, the County rented the Site, and in September, 1962, the County purchased the Site.

The Site comprises approximately 56 acres and was previously used as a sand and gravel pit. During the time period in which the County rented the Site and thereafter until sometime in 1968, the Site was utilized as a solid waste disposal facility.[4] The County itself did not directly maintain control of the day-to-day disposal activities at the Site but instead retained Landfill, Inc. and later Material Transit, Inc. to assume responsibility for managing such activities. According to the Remedial Action Master Plan for the Site prepared for the United States Environmental Protection Agency ("EPA") in 1983, an estimated 1.9 million cubic yards of refuse was disposed of at the Site, of which 30% or 600,000 cubic yards was placed beneath the seasonal water table.

In 1972, in response to concern over reports of pollutants emanating from the Site, the County retained a consulting firm to investigate the conditions at the Site. The report submitted pursuant to this investigation noted the poor condition of the Site[5] as well as the fact that leachate from the Site had entered the Upper Potomac

---

**2.** Artesian asserts that these efforts were made in response to steadily increasing customer demand and the declining physical condition of the existing wells while the County contends that Artesian raised its average daily pumpage simply to establish more extensive water rights claims.

**3.** The County asserts that the maximum daily average pumped by Artesian was the 3.3 MGD it pumped in 1972.

**4.** There is some dispute as to the types of wastes which were disposed of at the Site. Artesian claims that both industrial and municipal solid wastes were disposed of at the Site while the County insists that there is no evidence to show that the Site was intended to be used for the disposal of anything but municipal waste, and further, that if commercial and/or industrial wastes were disposed of at the Site, it was without the knowledge or permission of the County.

**5.** The report described the condition of the Site in 1972 as follows:

The landfill surface has subsided irregularly up to several feet, in response to decomposition of the thick section of poorly compacted and heterogeneous refuse. Such uneven settlement has created depressions on the once graded surface, which trap precipitation that might otherwise run off. The permeable nature of the cover material permits a high percentage of the precipitation to infiltrate to the refuse.

A weed cover has established itself on the surface; this aids in stabilizing the cover against erosion and transpires some of the infiltrated precipitation which would otherwise enter the refuse. Unfortunately, the weeds have been unable to prevent deep erosion gullies from forming on the steep face of the landfill along Army Creek. Such erosion has exposed once-buried refuse and resulted in intermittent leachate springs, which drain overland to Army Creek.

In some areas, leachate saturates the ground between the landfill and the creek. Here, the vegetation has been killed, and the stench of organic decomposition products is very strong.

Plaintiff's Opening Brief, Exh. C. at 13.

Acquifer.[6] It recommended, *inter alia*, that a program be instituted to prevent further migration and infiltration of leachate into the groundwaters underlying the Site.

By early 1974, the County had begun to utilize a groundwater recovery system to control the migration of pollutants from the Site. In general terms, this system is comprised of a network of wells adjacent to the Site which withdraw contaminated water from around and under the Site to prevent its movement away from the Site. The contaminated water apparently is then discharged into Army Creek, a nearby stream.[7] Although this program was viewed at its inception as an emergency, contaminant control program, it continues to be used as a stop-gap measure more than a decade later.

As a further complicating factor, located several hundred feet east of the Site is the Delaware Sand & Gravel Landfill ("DS&G Landfill"), an inactive, ten acre disposal site containing both industrial and municipal wastes. As with the Site, the DS & G Landfill was used previously as a sand and gravel pit. Studies have indicated that numerous hazardous substances are present at the DS & G Landfill which pose a threat to the underlying Upper Potomac Aquifer.

Both the Site and the DS & G Landfill have been listed on the National Priorities List ("NPL") by EPA as sites posing a substantial risk or danger to the public health and welfare due to the release or threatened release of hazardous substances.[8] 49 Fed.Reg. 37070, 37085–87 (Sept. 21, 1984). Indeed, the Site has been designated a "Group One" site classifying it as one of the fifty worst hazardous waste disposal sites in the United States.

Artesian has brought this action seeking a monetary recovery from the County of over $10,000,000. As set forth in an October 6, 1983 demand letter from Ellis Taylor, President of Artesian, to Richard T. Collins, County Executive, Artesian's claim is comprised of the following elements: (1) $60,000 for monitoring and evaluating the impact on the Llangollen Wellfield of the release of hazardous substances from the Site, (2) $591,000 as compensation for property and equipment which has been idled by the restrictions on pumping imposed since 1972, (3) $1,082,000 representing the differential cost of temporary replacement water supplies between 1978 and 1985, (4) $3,458,000 for construction of an interconnection with the Chester Water Authority to provide permanent replacement water supplies, and (5) $4,938,000 representing the present value of the differential cost of purchasing permanent replacement water supplies from the Chester Water Authority until the year 2008 (the end of the estimated useful life of the facilities at the Llangollen Wellfield). In short, Artesian seeks recovery of all the costs it has incurred and expects to incur as a consequence of the pumpage restrictions imposed as a result of the release of contaminants from the Site into the Upper Potomac Aquifer. Artesian asserts that these costs are necessary "response" costs as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), and that since the County was and is the owner and operator of a facility from which there has been a release or threatened release of hazardous substances, 42 U.S.C. § 9607(a)(1), the County is strictly liable for such costs. Artesian

---

6. After describing the "extremely objectionable quality of ... leachate-affected water" from a well 800 feet from the Site, the report concluded that "[c]hemically and hydrologically, this contaminated water could only have originated at the [Site]." Plaintiff's Opening Brief, Exh. C at 23–24.

7. This discharge was covered by a NPDES permit between October 11, 1977 and August 15, 1979. Since then the County has reapplied for

such a permit, but, as of the time of the briefing, no final decision had yet been made on its application.

8. The NPL has been promulgated pursuant to Section 105(8) of CERCLA, 42 U.S.C. § 9605(8), as setting forth national priorities among known releases and threatened releases on the basis of "risk or danger to public health or welfare or the environment."

further contends that there is no material dispute of fact concerning any of the elements necessary to impose liability on the County, and hence, summary judgment on that issue is appropriate.

The County has responded with a plethora of legal theories and factual disputes seeking to have the case or portions thereof dismissed, or at the very least, to avoid partial summary judgment in Artesian's favor. Given my view of the case, I need only address a few of the County's many contentions.

## DISCUSSION

### A. *Sovereign Immunity*

As an initial matter, the County asserts that this Court is barred from entertaining Artesian's CERCLA claims because the County is clothed with immunity from tort claims. In response, Artesian argues that the statute conferring such immunity upon the County is not applicable with respect to Artesian's CERCLA claims, and that even if it is, it is rendered inapposite by the Supremacy Clause of the United States Constitution.

The Delaware County and Municipal Tort Claims Act ("Tort Claims Act"), 10 Del.C. § 4010 et seq. (1984), states that "[e]xcept as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages." 10 Del.C. § 4011(a) (1984). A "governmental entity" is defined as including any county. 10 Del.C. § 4010(2) (1984). More specifically, the Tort Claims Act expressly provides that governmental entities are immunized from damage claims arising out of the release of pollutants into any body of water, as follows:

> Notwithstanding § 4012 of this title, a governmental entity shall not be liable for any damage claim which results from ... [t]he discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalines, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or

upon land, the atmosphere or any watercourse or body of water, except as provided in subdivision (3) of § 4012 of this title.

10 Del.C. § 4011(b)(5) (1984).

Section 4012 of the Tort Claims Act sets forth several exceptions to the general grant of immunity contained in Section 4011, including the following:

> A governmental entity shall be exposed to liability for its negligent acts or omissions causing property damage, bodily injury or death in the following instances:
>
> . . . . .
>
> [I]n *the sudden and accidental* discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalines and toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.

10 Del.C. § 4012(3) (1984) (emphasis added). Any question as to whether this exception is applicable to the case at hand has been laid to rest by Vice-Chancellor Hartnett's opinion in *Artesian Water Company v. New Castle County*, C.A. No. 5106 (Del.Ch. Aug. 4, 1983), where it was held that Artesian's damage claims against the County arising out of the same set of facts alleged here were barred by the Tort Claims Act.

> The leachate contamination at issue has been ongoing for more than a decade and can hardly be characterized as sudden. There is, therefore, no exception to the immunity granted in 10 *Del.C.* §§ 4010–4013 as to the claims of [Artesian]. It is therefore clear that 10 *Del.C.* § 4011 grants immunity to the County from damages arising out of the type of injury claims in the present suit.

*Id.* at 21.

However, Vice-Chancellor Hartnett's decision does not completely dispose of the issue of whether the Tort Claims Act is applicable to this action. In the parallel state proceedings, Artesian based its damage claim on a nuisance theory of liability.

As such, Artesian's claim was clearly a "tort claim ... seeking recovery of damages." 10 Del.C. § 4011(a) (1984). Whether or not Artesian's claims under CERCLA are tort claims seeking recovery of damages, however, is open to debate. *See United States v. Argent Corp.*, 21 E.R.C. 1353, 1354 (D.N.M. Dec. 20, 1983) (demand for jury trial pursuant to Seventh Amendment rejected on grounds that an action for response costs under CERCLA is analogous to an equitable action for restitution rather than a nuisance action under common law); *United States v. Wade*, 20 E.R.C. 1853, 1855 (E.D.Pa. Feb. 21, 1984) (same); *United States v. Northeastern Pharmaceutical and Chemical Co.*, 20 E.R.C. 1401 (W.D.Mo. Sept. 30, 1983); *United States v. Reilly Tar & Chemical Co.*, 20 E.R.C. 1052 (D.Minn. June 24, 1983). I need not resolve that issue, however.

 The Supremacy Clause of the Constitution[9] requires that where state and federal law conflict, state law must yield. *Michigan Canners & Freezers Association, Inc. v. Agricultural Marketing & Bargaining Board*, — U.S. —, —, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984).

> [S]tate law is ... preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, —, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). *See also Michigan Canners & Freezers Association, Inc., supra; Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm.*, 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983). In the case at bar, federal law mandates that political subdivisions be legally responsible, *inter alia*, for response costs incurred in taking removal or remedial actions at sites owned or operated by such political subdivisions; state law purports to say that they are not so liable. If this is not an actual conflict situation, it clearly is one in which Delaware's Tort Claims Act stands as an obstacle to the accomplishment of the full purposes and objectives which Congress sought to fulfill in enacting CERCLA. Therefore, the Tort Claims Act is preempted.

CERCLA imposes liability on, *inter alia*, the owner or operator of a facility from which there has been a release or threatened release of a hazardous substance that causes the incurrence of response costs for the full amount of such response costs. 42 U.S.C. § 9607(a)(1). "Owner or operator" is defined in the case of an onshore facility as *"any person* owning or operating such facility", and in the case of an abandoned facility as *"any person* who owned, operated, or otherwise controlled activities at such facility immediately prior to such abandonment." 42 U.S.C. § 9601(20)(A) (emphasis added). Most importantly for purposes of this analysis, CERCLA defines "person" very broadly to include "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, *political subdivision of a State*, or any interstate body. 42 U.S.C. § 9601(21) (emphasis added). Without question the County falls within this definition, and consequently, within the ambit of CERCLA's liability provisions. To allow the Tort Claims Act to insulate the County from such liability would be to contravene the express intent

---

9. The Supremacy Clause provides, as follows: This Constitution; and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const., art. 6 Cl. 2.

of Congress. In the face of such clear conflict, any immunity conferred on the County by the Tort Claims Act must fall. Therefore, the County cannot interpose the defense of tort claims immunity as a bar to Artesian's claims under CERCLA.

■ Although the County vigorously opposes this conclusion, I find its contentions unpersuasive. The County argues that while the definition of person does in fact include the County, Congress intended to differentiate between governmental and nongovernmental entities for purposes of CERCLA liability. As support for this assertion, the County points to language in Sections 107(g), 107(i) and 107(j) of CERCLA, 42 U.S.C. §§ 9607(g), (i) and (j).

Section 107(g) of CERCLA states:

Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under this section.

42 U.S.C. § 9607(g). The County argues that Congress inserted this provision in order to override the immunity traditionally accorded the federal government, and therefore, if Congress had intended to likewise override immunity conferred upon state and local governmental entities, it would have expressly done so. While CERCLA is not a model of clarity, I find that Section 107(g) can be read as simply an amplification of CERCLA's definition of "person". 42 U.S.C. § 9601(21). In short, Section 107(g) indicates that Congress meant what it said when it included the term "United States Government" in the definition of "person". The lack of a similar provision concerning non-federal governmental entities does not compel a conclusion that Congress did not intend to include such entities within the ambit of CERCLA's liability provisions.

Section 107(i) of CERCLA provides that "[n]o person (*including the United States or any State*) may recover under authority of this section for any response costs or damages resulting from the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act." 42 U.S.C. § 9607(i) (emphasis added). Similarly, Section 107(j) of CERCLA provides that "[r]ecovery by any person (*including the United States or any State*) for response costs or damages resulting from a federally permitted release shall be pursuant to existing law in lieu of this section." 42 U.S.C. § 9607(j) (emphasis added). The County argues that since the definition of "person" includes the "United States Government" and any "State", the parenthetical clauses in the above-noted sections are mere surplusage unless the definition of "person" is more restrictive than it facially appears. A more reasonable explanation is that the parenthetical clauses were added for emphasis rather than as an indirect way of modifying the definition of "person".

Finally, the County asserts that *United States v. Union Gas Co.*, 575 F.Supp. 949 (E.D.Pa.1983) compels a different conclusion than the one I reach today. In *Union Gas*, Judge Bechtle held that a suit pursuant to CERCLA by a private party against the Commonwealth of Pennsylvania to recover response costs was barred by the Eleventh Amendment since CERCLA did not contain sufficiently clear indicia of an intent by Congress to abrogate the immunity conferred upon the States by the Eleventh Amendment. As the County concedes, it is not protected by the Eleventh Amendment, and therefore, the case is clearly distinguishable from the proceedings at bar.

### B. *Private Right of Action*

■ Artesian has grounded its claims for response costs on Section 107(a)(4)(B) of CERCLA which provides, in relevant part, as follows:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—the owner and operator of a vessel ... or a facility ... from which there is a release, or a threatened release

which causes the incurrence of response costs, of a hazardous substance, shall be liable for ... any other necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a)(4)(B). The County contends that notwithstanding this provision, there is no private right of action under CERCLA. I find this contention to be without merit.

In *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa. 1982), Judge Ditter upheld the City of Philadelphia's right to bring an action under CERCLA against responsible parties for response costs incurred by the City in cleaning up one of its landfills in which industrial wastes allegedly generated by the defendants had been illegally dumped. In discussing its decision, the court commented as follows:

> [I]t is clear from the discussions which preceded the passage of CERCLA that the statute is designed to achieve one key objective—to facilitate the prompt clean up of hazardous dumpsites by providing a means of financing both governmental and private responses and by placing the ultimate financial burden upon those responsible for the danger. The liability provision is an integral part of the statute's method of achieving this goal for it gives a private party the right to recover its response costs from responsible third parties which it may choose to pursue rather than claiming against the fund.

*Id.* at 1142–43.

Similarly, in *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1428 (S.D.Ohio 1984), the court sustained the rights of private party plaintiffs' to pursue their claims for response costs under CERCLA, finding that "[i]n light of the plain language of the act

itself, and the broad judicial interpretation reflected in the *Stepan* [sic] *Chemical* case, the plaintiffs ... have the right to sue under CERCLA's liability provision."

More recently, in *Pinole Point Properties v. Bethlehem Steel Corp.*, 596 F.Supp. 283 (N.D.Cal.1984), Judge Aguilar rejected Bethlehem Steel's argument that Section 107 does not authorize a private right of action but merely establishes liability for purposes of Sections 111 and 112 of the CERCLA, 42 U.S.C. §§ 9611 and 9612, which govern the use of the Superfund, and held that "section 107 does provide for a private cause of action and a basis of liability that is separate and distinct from the liability created in sections 111 and 112." *Id.* at 289.

Indeed, virtually every court that has addressed this issue has found that Section 107 of CERCLA provides for some sort of private right of action. *See, e.g., Bulk Distribution Centers, Inc. v. Monsanto Co.*, 589 F.Supp. 1437, 1443–44 (S.D.Fla. 1984); *Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 21 E.R.C. 1108, 1114–15 (C.D.Cal. March 5, 1984); *Wickland Oil Terminals v. Asarco, Inc.*, 590 F.Supp. 72 (N.D.Cal.1984) (by implication); *Homart Development Co. v. Bethlehem Steel Corp.*, No. C84–2579 WWS (N.D.Cal. July 12, 1984) (bench opinion); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 588 F.Supp. 515 (D.Mass.1983). *But see Walls v. Waste Resources Corp.*, No. Civ. 2–83–418 (E.D.Tenn. March 20, 1984) (approving Magistrate's report and recommendation dismissing plaintiffs' claims on basis, *inter alia*, that Congress did not intend to create any private right of action under CERCLA). Based on the aforementioned authority and the clear language of the statute, I find that Artesian may properly sue under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), to recover response costs from the County.[10]

---

**10.** The County, in its brief, cites as support for its position that CERCLA does not provide for any private right of action the fact that earlier versions of legislation which eventually became CERCLA contained provisions, subsequently deleted, that allowed for private suits to recover

compensation for personal injuries, property damage, and/or lost profits or wages resulting from the release of hazardous substances. *See, e.g.,* 126 Cong.Rec. S14964 (daily ed., Nov. 24, 1980) (remarks of Senator Randolph) ("Last week Senator Stafford and I offered an amend-

## C. *Necessity of Prior Governmental Action Or Approval*

Section 107(a)(4)(B) of CERCLA limits potential liability to "any other *necessary* costs of response ... *consistent with the national contingency plan.*" 42 U.S.C. § 9607(a)(4)(B) (emphasis added). The County has seized upon this language to argue that no private right of action exists unless there has been prior governmental approval of the response actions taken by the private litigant.

■ I think it clear that CERCLA itself does not require prior governmental approval of response actions as a prerequisite to recovery of response costs by a private party under Section 107. 42 U.S.C. § 9607. In Section 111(a)(2) of CERCLA, Congress provided that in order for "necessary response costs" to be recoverable from the Superfund, "such costs must be approved under [the national contingency] plan and certified by the responsible Federal official." 42 U.S.C. § 9611(a)(2). In sharp contrast, Congress included no such requirement when it authorized recovery of privately incurred response costs from a party made financially responsible under Section 107.[11] The fair inference is that Congress did not intend for CERCLA to impose such a requirement.

To say that CERCLA itself does not require prior governmental approval as a prerequisite to a private action, however, is not to say that such a prerequisite does not exist. Congress specifically provided in Section 107(a)(4)(B) of CERCLA that private response costs must be "consistent with the national contingency plan" if they are to be recoverable. 42 U.S.C. § 9607(a)(4)(B). Under Section 105 of CERCLA, Congress required that a revised national contingency plan be promptly promulgated and that it "include a section ... to be known as the national hazardous substance response plan." 42 U.S.C. § 9605. Congress further mandated that this section of the revised NCP include, *inter alia,* at a minimum:

> methods and criteria for determining the appropriate extent of removal, remedy, and other measures authorized by this chapter [and] appropriate roles and responsibilities for the Federal, State, and local governments and for interstate and nongovernmental entities in effectuating the plan.

42 U.S.C. §§ 9605(3) and (4). These provisions of Section 105 provide ample authority for EPA to include in its revisions of the NCP a requirement that governmental approval of response actions be a prerequisite to recovery of the costs thereof from responsible parties. Accordingly, I must look

ment called the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.... We have made many concessions from the original bill reported last summer.... We have deleted the Federal cause of action for medical expenses or property or income loss."). I agree with the County that Congress, in enacting CERCLA, intended to provide a vehicle for cleaning up and preserving the environment from the evils of improperly disposed of hazardous substances rather than a new font of law on which private parties could base claims for personal and property injuries. However, simply because Congress may have deleted the right for private litigants to sue under CERCLA for personal and/or property damages does not mean that Congress likewise intended to abrogate the private right of action to recover necessary response costs. The plain language of Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), indicates the contrary.

**11.** Nor, contrary to the County's suggestion, does Section 107 of CERCLA impose a require-

ment that governmental response costs be incurred before private response costs become recoverable. The County argues that such a requirement is implicit in the reference to "any *other* necessary costs of response", 42 U.S.C. § 9607(a)(4)(B) (emphasis added), immediately following the provision establishing liability for "all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). While this position finds some support in the case law, *see Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437, 1446–47 (S.D.Fla.1984); *Wickland Oil Terminals v. Asarco, Inc.,* 590 F.Supp. 72, 77 (N.D.Cal.1984), it is much more reasonable to infer that Congress used the word "other" simply to differentiate between government response costs and private response costs rather than as an oblique but substantial qualification to the broad language of Section 107(a)(4)(B) authorizing suits by private parties.

to the NCP in order to resolve the issue before me.

When one turns to the NCP, one finds that Section 300.25(d), 40 C.F.R. § 300.25(d) (1984), tracks CERCLA's requirement that those seeking reimbursement of response costs from the Superfund must have procured prior governmental approval for their expenditures.[12] In addition, however, the remainder of the NCP provides that governmental approval is a prerequisite to the recovery of some response costs but not to the recovery of other such costs.

12. Section 300.25 of the NCP provides:
> If any person other than the Federal government or a State or person operating under contract or cooperative agreement with the United States, takes response action and intends to seek reimbursement from the Fund, such actions to be in conformity with this Plan for purposes of section 111(a)(2) of CERCLA may only be undertaken if such person notifies the Administrator of EPA or his/her designee prior to taking such action and receives prior approval to take such action.

40 C.F.R. § 300.25(d) (1984). Unlike its companion statutory provision, 42 U.S.C. § 9611(a)(2), this section of the NCP does not give rise to the inference that prior governmental approval is not necessary as a prerequisite to the recovery of response costs by private parties. However, the remainder of the NCP, unlike the remainder of CERCLA, contains provisions which affirmatively require such approval in certain situations.

An additional observation is appropriate in connection with this section of the NCP. The preamble to the NCP notes, "[s]ection 300.25(d) does not apply to private parties who undertake response actions, but do not intend to seek reimbursement from the Fund." 47 Fed.Reg. 31180, 31196 (July 16, 1982). In *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283, 290 (N.D.Cal.1984), the court relied upon this observation as support for the proposition that governmental approval of response actions is not a prerequisite to the recovery of response costs by private parties pursuant to Section 107(a)(4)(B) of CERCLA. I respectfully disagree. Given the express provisions of the NCP relating to remedial actions and the comments in the preamble thereon, I believe that this sentence should be read to mean no more than it says or necessarily implies. Section 300.25(d) of the NCP does not apply to parties who do not seek reimbursement from the Superfund. Consequently, one must look elsewhere in the NCP to determine under what circumstances and conditions response costs can be recovered from non-Superfund sources.

For example, in Subpart F of the NCP, 40 C.F.R. §§ 300.61–300.71 (1984), relating to "Hazardous Substances Response", there is no requirement that "removal" actions be authorized by a governmental entity in order to render the costs incurred thereby recoverable pursuant to a suit under Section 107 of CERCLA.[13] *See* 40 C.F.R. §§ 300.65, 300.66 (1984). Removal actions are those response actions which are taken on an emergency or short term basis in order to prevent immediate harm to the public health or the environment.

Moreover, I note that Section 300.25(e) of the proposed revisions to the NCP which provided that "[a] person that does not intend to seek reimbursement from the Fund for removal or remedial costs does not need to obtain preauthorization ... to act consistent with this plan," 47 Fed.Reg. 10972, 10984 (March 12, 1982), was deleted in the final version of the revised NCP, in response to comments received by EPA indicating that at least some of the commentators had construed the proposed section to imply that no prior governmental authorization of private response actions was necessary as long as no claim for reimbursement from the Superfund would be made. This indicates that EPA did, in fact, intend for governmental preauthorization to be a predicate for bringing a private action pursuant to Section 107 to recover certain types of response costs.

13. "Removal" in the context of CERCLA has been defined as follows:
> [R]emove or removal means the clean-up or removal of released hazardous substances from the environment; such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment; such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances; the disposal of removed material; or the taking or [sic] such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, which may otherwise result from such release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 104(b) of CERCLA, and any emergency assistance which may be provided under the Disaster Relief Act of 1974.

40 C.F.R. § 300.6 (1984).

As explained in the preamble to the NCP, removal actions consist of immediate removal activities which the EPA has characterized as "emergency response" actions and planned removal activities which EPA has characterized as "short term but not emergency response" actions. 47 Fed.Reg. 31180, 31181 (July 16, 1982). In these contexts, time is frequently of the essence in minimizing the danger to the public health and the environment and a private party may be in at least as good a position, if not a better position, to expeditiously control and/or clean-up the hazardous substances than a governmental entity. To require prior governmental authorization as a prerequisite to recovery of response costs from responsible parties could needlessly discourage emergency response actions by private entities. *See Homart Development Co. v. Bethlehem Steel Corp.*, No. C84–2579 WWS (N.D.Cal. July 12, 1984).

"Removal costs" are not the only "response costs" discussed in the NCP, however. There are the costs of "remedial action" as well. Remedial actions, as a general proposition, are "those actions consistent with permanent remedy ... to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 40 C.F.R. § 300.6 (1984).[14] As the preamble to the NCP explains, a "remedial action" is a "long term response," 47 Fed.Reg. 31180, 31181 (July 16, 1982), and generally involves "long-term actions to mitigate threats primarily from hazardous waste management facilities." *Id.* at 31182. The difference between removal actions and remedial actions and the lack of experience with the latter caused the EPA to take a different approach with respect to remedial actions:

> The Agency has far less experience with remedial actions than with removal actions. Under the removal program in section 311 of the [Clean Water Act], EPA gained a great deal of experience in undertaking short-term clean-up actions, primarily in response to spills of oil. However, CERCLA created remedial action as a new type of response. In order to assure that response personnel have adequate guidance to follow when investigating, planning, and implementing remedial response, EPA has provided a detailed systematic procedure for determining the appropriate extent of remedy in Subpart F....

*Id.*

Section 300.68 of the NCP, 40 C.F.R. § 300.68 (1984), pertains to remedial actions. It provides for "Fund-financed remedial action" as well as for remedial actions taken by the responsible private parties. In particular, that section provides as follows:

> The lead [federal or state] agency shall evaluate the adequacy of clean-up proposals submitted by responsible parties or determine the level of clean-up to be sought through enforcement efforts, by consideration of the factors discussed in paragraphs (e) through (j) of this section. The lead agency will not, however, apply the cost balancing considerations discussed in paragraph (k) of this section to determine the appropriate extent of responsible party clean-up.

40 C.F.R. § 300.68(c) (1984).[15]

Paragraph (k), which does *not* play a role in the lead agency's consideration of private clean-up proposals, requires a bal-

---

**14.** The term also includes:
> the costs of permanent relocation of residents and businesses and community facilities [but only] where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances or may otherwise be necessary to protect the public health or welfare.

40 C.F.R. § 300.6 (1984).

**15.** The comments in the preamble regarding Subpart F confirm the intent reflected in the above-quoted portion of Section 300.68. "Although most of Subpart F applies to Fund-financed response, it should be noted that § 300.68(e) through (j) also applies to clean-up by responsible parties." 47 Fed.Reg. 31180, 31198 (July 16, 1982).

ancing of the need for federally financed remedial action against "the amount of money available in the Fund to respond to other sites." 40 C.F.R. § 300.68(k) (1984). Paragraphs (e) through (j) of Section 300.-68, which do pertain to private remedial action, set forth what EPA has broadly characterized as "a methodology which ... provide[s] [for] structured and reasoned decision-making while still allowing the flexibility to deal with unique and unforeseen characteristics." 47 Fed.Reg. 31180, 31184 (July 16, 1982). More specifically, paragraph (e) provides a list of factors to be considered in determining the type of appropriate remedial action. 40 C.F.R. § 300.68(e) (1984). Paragraph (f) requires the "lead agency" or a responsible party in the case of private remedial action to conduct a remedial investigation to determine the nature and extent of the problem presented by the release. 40 C.F.R. § 300.-68(f) (1984). Paragraph (g) provides that, based on the remedial investigation and the factors listed in paragraph (e), a limited number of alternatives be developed "for either source control or offsite remedial actions (or both)." 40 C.F.R. § 300.68(g) (1984). Paragraph (h) requires that the alternatives developed pursuant to paragraph (g) be evaluated in light of cost, effects of implementation, and engineering feasibility. 40 C.F.R. § 300.68(h) (1984). Paragraph (i) provides that following the initial screening mandated by paragraph (h), a more detailed analysis of the remaining alternatives be developed. 40 C.F.R. § 300.68(h) (1984). Finally, paragraph (j) provides, as follows:

> The appropriate extent of remedy shall be determined *by the lead agency's selection of the remedial alternative which the agency determines is cost-effective* (i.e. the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of public health, welfare, or the environment).

40 C.F.R. § 300.68(j) (1984).

■ Contrary to Artesian's position, the NCP does not contain specific substantive criteria by which response costs can be judged as either consistent or inconsistent with the NCP. Rather, the NCP sets forth a framework of analysis as outlined above in which the final decision making authority is vested in the "lead agency":

> EPA has developed a system for decision-making which has as its primary feature a reasoned process that contains a series of checks throughout to ensure that the decision-making process produces an effective remedy. The methodology emphasizes cost-effective, environmentally sound remedies which are feasible and reliable from an engineering standpoint.

47 Fed.Reg. 31180, 31185 (July 16, 1982). Consequently, I find that for response costs incurred pursuant to remedial actions to be consistent with the NCP, they must have been approved as appropriate by the "lead agency".

In reaching this conclusion, I am mindful of the fact that Section 300.68 of the NCP can be read literally as addressing only situations in which the party taking remedial actions and incurring remedial expenses is a party who may be held responsible for part or all of the response costs incurred at a site. Given the fact that almost anyone associated in any way with a site is potentially a responsible party under Section 107 of CERCLA and given the nature of remedial actions, the vast majority of cases in which such actions are undertaken by a private party will be ones in which that party is a potentially responsible party. By contrast, Artesian appears not to be a potentially responsible party and one could argue that the NCP simply makes no provision for this type of case. However, given the express Congressional mandate in Section 107 of CERCLA that the NCP determine which response costs will be recoverable in a private action and which will not, I am reluctant to attribute such an intent to the EPA. EPA has determined that long term solutions to hazardous waste problems should be worked out through a process that culminates in a decision by the lead agency. I think the fair inference is

that EPA contemplated the utilization of that process to determine the appropriate extent of remedial action whether or not the party proposing to undertake such action is a potentially responsible one.

My conclusion that remedial actions must be governmentally approved in order for their costs to be recoverable under Section 107 of CERCLA is consistent with the analysis of the relevant policy considerations set forth in *Bulk Distribution Centers, Inc. v. Monsanto Co.*, 589 F.Supp. 1437 (S.D.Fla.1984), with which I find myself in general agreement.[16] While there may be some situations in which private parties have as much or more expertise concerning cleanup of a specific site than the governmental "lead agency", I believe that the public is generally benefited and the environment better protected by a system in which the government bears the ultimate responsibility for balancing competing interests to arrive at environmentally sound and cost effective remedial actions. Furthermore, in contrast to removal actions, remedial actions are long term and perma-nent in nature allowing greater time for study and analysis. Under such circumstances, requiring governmental authorization of private remedial actions is unlikely to have the same negative impact on public health and the environment as such a requirement would in the context of removal actions. More importantly, I find this to be the system which has been adopted in the NCP.[17]

■ In the case at bar, Artesian has neither alleged nor argued that any of its alleged response activities have been processed and approved in the manner contemplated by paragraphs (e) through (j) of Section 300.68 of the NCP. 40 C.F.R. §§ 300.-68(e)–(j) (1984). The complaint contains only a conclusory allegation that Artesian "has incurred and will incur response costs, consistent with the national contingency plan, in excess of $10.0 million", Complaint ¶ 39, and the statement that since 1973, DNREC has restricted Artesian's withdrawals from the Llangollen Wellfield to 2.0 MGD. Complaint ¶ 25. While Artesian

---

**16.** In *Bulk Distribution Centers, Inc. v. Monsanto Co., supra,* the court held that while CERCLA provides for a private right of action to recover response costs from responsible parties, a "fundamental prerequisite" to such an action is "the existence of a state or federally approved cleanup proposal." 589 F.Supp. at 1446. The court grounded its decision in part on broad policy considerations, as follows:

Congress passed CERCLA principally to protect the public and the environment from the dangers posed by an actual or threatened hazardous release.... Achievement of this goal is not realized easily, for environmental controversies often involve parties whose interests are widely divergent. For example, the party who seeks reimbursement for clean-up costs probably is eager to implicate others in the hope of lessening its own financial liability for the spill. Both the claimant and other parties ultimately implicated are concerned with the cost of the clean-up operation; ideally it should be affordable and effective. The general public has similar concerns, for it desires a remedial plan that cleans up the release, but at a price that is sufficiently low that its eventual cost can be internalized by the company.... In this court's view, the only practical way to safeguard the public's interest, while fairly mediating the competing concerns of the parties potentially responsible for cleaning up the release, is for the govern-ment to approve the clean-up proposal before it is implemented by the private parties. The government certainly is in a better position than are private parties to pass judgment on the efficacy of a clean-up proposal. To begin with, state or federal environmental agencies possess scientific and technological sophistication, along with an appreciation of the problems arising from hypertechnical environmental standards. Additionally, the clean-up proposal must comply with laws that the state or federal governments enforce, so it follows that their approval of a plan would be desirable to reduce a party's exposure to liability.

*Id.*

**17.** I am mindful that a number of courts have reached a conclusion inconsistent with the one here reached. *See, e.g., Pinole Point Properties, Inc. v. Bethlehem Steel Corp., supra; Homart Development Co. v. Bethlehem Steel Corp., supra.* On the other hand, a number of courts have rejected the arguments which Artesian here advances, albeit for somewhat different reasons. *See, e.g., Bulk Distribution Centers, Inc. v. Monsanto Co., supra; Wickland Oil Terminals v. Asarco, Inc., supra; Cadillac Fairview/California, Inc. v. Dow Chemical Co.,* 21 E.R.C. 1584 (C.D.Cal. Aug. 29, 1984); *Cadillac Fairview/California, Inc. v. Dow Chemical Co.,* 21 E.R.C. 1108 (C.D.Cal. March 5, 1984).

argues that this restriction by DNREC constitutes the requisite governmental approval, I do not understand it to suggest that DNREC's actions have come in the context of a process like that required in Section 300.68 of the NCP. 40 C.F.R. § 300.68. Nor do I understand Artesian to contend that any of its response actions are removal actions as contrasted with remedial actions. It follows, therefore, that the County's motion to dismiss should be granted.[18]

### CONCLUSION

For the foregoing reasons, I conclude that (1) the County may not invoke the Delaware Tort Claims Act to immunize itself from actions brought pursuant to CERCLA, (2) Section 107 of CERCLA, 42 U.S.C. § 9607, provides for a private right of action to recover response costs, and (3) the NCP requires that private parties obtain governmental approval of remedial actions in order to render the costs incurred in taking such action recoverable in a private suit under Section 107 of CERCLA, 42 U.S.C. § 9607.

18. The dismissal will be without prejudice to the filing of a new complaint should Artesian be able to secure the requisite approval for some or all of its remedial actions. While there may be an issue as to whether Artesian can obtain retroactive approval for costs already incurred so as to satisfy the requirements of the NCP, it is premature to address that issue at present.