ARTESIAN WATER COMPANY, Plaintiff,

v.

The GOVERNMENT OF NEW CASTLE COUNTY, Defendant and Third-Party Plaintiff,

v.

LANDFILL, INC., a Delaware corporation, Material Transit, Inc., a Delaware corporation, Edgar Thomas Harvey, Edgar Thomas Harvey, Jr., W. Lawrence Knotts, Henry A. Twardus, William W. Saienni, Elmer D. Saienni, Salvatore J. Saienni, Dominic Cantera, Marian Cantera, Delaware Sand and Gravel Company, a Delaware corporation, Anita Dell Aversano, individually and as Executrix of the Estate of Joseph Dell Aversano, Vincent Dell Aversano, Marcella Dell Aversano, Stauffer Chemical Co., a Delaware corporation, Haveg Industries, Inc., a Delaware corporation, Champlain Cable Corporation, a Delaware corporation, Angelo Terranova, Stanley J. Twardus & Sons, Inc., a Delaware corporation, and SCA Services, Inc., a Delaware corporation, Third-Party Defendants.

Civ. A. No. 83–854 MMS.

United States District Court, D. Delaware.

April 24, 1987.

Thomas D. Whittington, Jr., of Whittington & Aulgur, Wilmington, Del. (E. Barclay Cale, Jr., Frank M. Thomas, Jr. and Lynn A. Clouser, of Morgan, Lewis & Bockius, Philadelphia, Pa.), for Artesian Water Co.

B. Wilson Redfearn, of Tybout, Redfearn, Casarino & Pell, Wilmington, Dela. (Michael A. Brown, George J. Weiner, William Roger Truitt, and Donavee Berger, of Schmeltzer, Aptaker & Sheppard, Washington, D.C.), for New Castle County.

Paul H. Spiller, of Kimmel & Spiller, Wilmington, Del., for Landfill, Inc., Material Transit, William Saienni, Elmer Saienni and Salvatore Saienni.

Januar D. Bove, James M. Mulligan, Jr. and Jeffrey B. Bove, of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for Stauffer Chemical Co.

Charles S. Crompton, Jr. and James F. Burnett, of Potter, Anderson & Corroon,

Wilmington, Del., for Haveg Industries, Inc. and Champlain Cable Corp.

F. Michael Parkowski and Bonnie M. Benson, of Parkowski, Noble & Guerke, Dover, Del., for Delaware Sand & Gravel and Anita Dell Aversano.

Paul S. Swierzbinski, Wilmington, Del., for Angelo Terranova.

John James Conly, Wilmington, Del. (John F. Stoviak and Michael L. Krancer, of Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa.), for SCA Services, Inc.

James McC. Geddes, of Ashby, McKelvie & Geddes, Wilmington, Del., for E.T. Harvey.

Carl A. Agostini, of Agostini & Little, Wilmington, Del., for Stanley Twardus & Sons.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Plaintiff Artesian Water Company ("Artesian") seeks to recover costs that it claims have been or will be incurred as a result of a release or threatened release of hazardous substances from a landfill owned by defendant New Castle County ("the County"). Artesian asserts these costs are "response costs" as that term is defined by the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq.

On February 14, 1985, Judge Stapleton granted the County's motion to dismiss Artesian's CERCLA claim. *Artesian Water Co. v. New Castle County*, 605 F.Supp. 1348 (D.Del.1985) (*"Artesian I"*). In that decision, the Court rejected the County's assertion of sovereign immunity, *id.* at 1353–55, and found that CERCLA grants a private right of action. *Id.* at 1355–56. In granting the County's motion to dismiss, however, the Court held that regulations promulgated by the United States Environmental Protection Agency ("EPA") required prior governmental approval of certain response actions as a prerequisite to the recovery by a private party of the costs of such actions.[1] *Id.* at 1357–62. The dismissal was without prejudice to the filing of a new complaint if Artesian were to obtain governmental approval of some or all of its proposed responses.

Shortly after the decision in *Artesian I*, plaintiff moved for reargument in light of the publication of proposed amendments to the EPA regulations implementing CERCLA, collectively known as the National Contingency Plan ("NCP").[2] *See* 50 Fed.Reg. 5862 *et seq.* (Feb. 12, 1985). Consequently, the Court ordered a stay of further proceedings pending adoption by the EPA of a final version of the proposed amendments,[3] which was ultimately published on November 20, 1985. *See* 50 Fed.Reg. 47911 *et seq.* (Nov. 20, 1985). The final revisions to the NCP make it clear that no prior governmental approval is required for the private recovery of response costs.[4] *Id.* at 47934.

1. Specifically, the Court held that prior governmental approval was a prerequisite to the private recovery of the costs of long-term "remedial actions" but not short-term "removal actions." *Artesian I*, 605 F.Supp. at 1357–62. Because Artesian did not contend that any of its response actions were removal actions as opposed to remedial actions, and because the Court found that Artesian had obtained no prior governmental approval, its CERCLA claim was dismissed.

2. Under section 107 of CERCLA, private response costs must be "consistent with the national contingency plan" if they are to be recoverable. 42 U.S.C. § 9607(a)(4)(B). Section 105 requires the promulgation of a revised national contingency plan that "shall include a section ... to be known as the national hazardous substance response plan which shall establish pro-

cedures and standards for responding to releases of hazardous substances, pollutants, and contaminants." *Id.* § 9605.

3. The Court also granted Artesian an opportunity to amend its complaint to state a claim for the recovery of removal costs as opposed to remedial costs.

4. The preamble to the revised NCP explains:
 EPA ... believes that prior approval is unwarranted for response actions for which no claim against the Fund will be made and which are not taken in response to an enforcement action under CERCLA section 106. The costs and delays of prior approval by EPA of private party responses could significantly reduce the number and scope of those responses. Delaying private party responses pending negotiations between PRPs [poten-

Thus, that part of the decision in *Artesian I* dealing with the need for governmental approval is no longer controlling in this case.

Currently before the Court is the County's motion to dismiss Artesian's amended complaint or, in the alternative, for summary judgment, and Artesian's motion for partial summary judgment on liability. The Magistrate has written a thoughtful and well-reasoned recommendation that the County's motion be denied in part and that Artesian's motion be denied, and has done much to illuminate the issues before the Court. Although I agree with the majority of the Magistrate's conclusions, I disagree with his resolution of some of the novel and difficult questions of law raised by this case. Consequently, I will deny the County's motion and grant Artesian's motion only with respect to Artesian's claim for recovery of its monitoring and evaluation expenses. In all other respects, the County's motion will be granted and Artesian's motion will be denied.

## I. FACTS

Artesian is a water utility that provides drinking water to approximately 130,000 residents of New Castle County, Delaware. The sources of supply for Artesian's public water system are a series of wells situated throughout its service territory of roughly 106 square miles. Since 1946, one of Artesian's primary sources of supply has been its Llangollen Wellfield, located approximately seven miles south of Wilmington, Delaware. The Llangollen Wellfield draws water from the Upper Potomac Aquifer, one of the most productive groundwater zones in New Castle County.

By 1969, Artesian had seven wells on line in the Llangollen Wellfield with a production capacity of 4.9 million gallons per day ("MGD"). Following the construction of five replacement wells in 1971, Artesian was able to raise its average daily pumpage from the Llangollen Wellfield to 3.85 MGD and its peak withdrawals to 5.35 MGD.

In 1972, the Delaware Department of Natural Resources and Environmental Control ("DNREC") informed Artesian that groundwater pollution had been discovered in the vicinity of the Llangollen Wellfield. DNREC established an aquifer monitoring program and found the most likely source of the groundwater pollution to be the Army Creek Landfill ("the Site"), a landfill located about 3000 feet north-northwest of the Llangollen Wellfield. Thereafter, in 1973, DNREC directed Artesian to limit its withdrawals from the Llangollen Wellfield to 2.0 MGD, a restriction that has continued to the present.

The Site comprises roughly 56 acres and was previously used as a sand and gravel pit. From about 1960 until 1968, the Site was used as a solid waste disposal facility. The County has held title to the Site only since 1974, although it had retained various third parties to manage disposal activities at the Site since 1960.[5] According to the EPA's September 30, 1986 Record of Decision selecting a remedial alternative for the Site, an estimated 1.9 million cubic yards of refuse was disposed of at the Site, of which

tially responsible parties] and the government would not only reduce incentives for other party responses, but could also harm the enforcement process by reducing incentives for PRPs to settle with the government expeditiously. In addition, based on past experience, EPA believes that private party and government responses for which cost recovery is sought are unlikely to overlap and, although such situations may arise, they are better addressed individually rather than by revising the NCP. EPA believes that the requirement that private party responses comply with all applicable Federal, State, and local requirements, including permit requirements, as appropriate, is sufficient to deter poorly planned cleanup proposals and mini-

mize the possibility of independent private party and government responses.
50 Fed.Reg. 47934 (Nov. 20, 1985). Thus, no prior governmental approval is required for either "remedial" or "removal" actions.

**5.** Under Delaware law prior to 1974, land owned by a county was titled to the State for use by the county. 9 *Del.C.* § 317 (amended 1974). In 1974, the statute was amended to transfer title in real estate back to the counties. 9 *Del.C.* § 317. Thus, although New Castle County rented the Site from 1960 until 1962 and purchased the Site in 1962, it has held title to the Site only since 1974.

30 percent or 600,000 cubic yards was placed beneath the seasonal water table.

A report prepared for the County in 1972 found that leachate from the Site had entered the Upper Potomac Aquifer. By early 1974, the County had begun to use a groundwater recovery system to prevent further migration and infiltration of leachate into the groundwater beneath the Site. The groundwater recovery system is made up of a network of wells adjacent to the Site that withdraw contaminated water from around and under the Site in order to prevent its movement away from the Site. As a result of the recovery well system, a groundwater divide now exists between the Site and the Llangollen Wellfield. Under the remedial alternative selected by the EPA in its recent Record of Decision for the Site, the recovery well system would continue to operate. In addition, the landfill would be capped to minimize the infiltration of rainwater.

A major complicating factor in the instant case is the presence of the Delaware Sand & Gravel Landfill ("DS & G Landfill"), an inactive, ten-acre waste disposal facility located several hundred feet east of the Site. The DS & G Landfill was also used previously as a sand and gravel pit. Studies have indicated that numerous hazardous substances in the DS & G Landfill pose a threat to the underlying Upper Potomac Aquifer.

Both the Site and the DS & G Landfill are listed on the EPA's National Priorities List ("NPL") as sites posing a substantial risk or danger to the public health and welfare due to the release or threatened release of hazardous substances.[6] *See* 40 C.F.R. part 300, app. B (1986). Out of the 703 sites listed on the NPL, the Site is ranked as the ninth most hazardous in the United States; the DS & G Landfill has a ranking of 227.

Artesian brought this lawsuit pursuant to section 107(a) of CERCLA, 42 U.S.C. § 9607(a), seeking a monetary recovery from the County of over $10 million. In addition to its private action, Artesian has presented a claim for payment out of the

Hazardous Substance Response Fund (commonly known as the "Superfund") pursuant to sections 111 and 112 of CERCLA, 42 U.S.C. §§ 9611–9612. In both proceedings, Artesian's claim is made up of the following elements: (1) $60,000 for monitoring and evaluating the impact on the Llangollen Wellfield of the release of hazardous substances from the Site; (2) $600,000 as compensation for the loss of capacity of Artesian's wells since pumping restrictions were imposed in 1973; (3) $1.0 million representing the differential cost of obtaining temporary alternative water supplies; and (4) $9.0 million representing the cost of obtaining permanent alternative water supplies, including construction of an interconnection with the Chester Water Authority. In short, Artesian seeks recovery for all of the costs it has incurred and expects to incur as a result of the pumping restrictions imposed after the detection of contaminants in the Upper Potomac Aquifer.

## II. ELEMENTS OF A CERCLA § 107 CLAIM

CERCLA was enacted in 1980 during the final months of the 96th Congress as a legislative response to the growing problem of toxic wastes, many of which were disposed of before their dangers were widely known and had contaminated precious land and water resources. The statute attempts to create a coherent answer to two related problems: the emergency abatement of releases of hazardous substances into the environment and the response, both short- and long-term, to the presence of hazardous wastes in existing disposal sites. Many of these sites had been abandoned by any party who could be held accountable for the cleanup. Wherever possible, however, CERCLA places the ultimate financial burden of toxic waste cleanup on those responsible for creating the harmful conditions. *See, e.g., Dedham Water Co. v. Cumberland Farms Dairy,* 805 F.2d 1074, 1081 (1st Cir.1986); *Lone Pine Steering Comm. v. EPA,* 777 F.2d 882, 886 (3d Cir.1985), *cert. denied,* ——

---

**6.** The NPL is promulgated pursuant to section 105(8) of CERCLA, 42 U.S.C. § 9605(8).

U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

Because CERCLA as finally enacted was the product of an unusually arduous process of political compromise,[7] it is hardly a model of concise legislative draftmanship. In general terms, the statute establishes the Superfund, which is financed primarily through excise tax revenues. The federal government is authorized to use the Superfund to finance governmental response activities, to pay claims arising from the response activities of private parties, and to compensate federal or state governmental entities for damage caused to natural resources. CERCLA § 111(a), 42 U.S.C. § 9611(a). In addition to the Superfund claim structure, CERCLA provides that the federal government, state governments, and private parties may sue those responsible for the generation, transportation, or disposal of hazardous substances. Id. § 107(a), 42 U.S.C. § 9607(a). Courts have uniformly imposed strict liability in construing the terms of section 107(a). See, e.g., New York v. Shore Realty Corp., 759 F.2d 1032, 1042 (2d Cir.1985); United States v. Maryland Bank & Trust Co., 632 F.Supp. 573, 576 (D.Md.1986); United States v. Northeastern Pharmaceutical & Chemical Co., 579 F.Supp. 823, 843–44 (W.D.Mo.1984); United States v. Price, 577 F.Supp. 1103, 1113–14 (D.N.J.1983); City of Philadelphia v. Stepan Chemical Co., 544 F.Supp. 1135, 1148 (E.D.Pa.1982). Liability is, however, subject to the defense that the release of a hazardous substance was caused solely by an act of God, an act of war, or an act or omission of a third party unrelated to the defendant. CERCLA § 107(b), 42 U.S.C. § 9607(b).

Responsible parties, or "covered persons," are liable under section 107(a) for the response costs incurred by the plaintiff.[8] CERCLA defines response costs as the costs of either "removal" actions or "remedial" actions.[9] Id. § 101(25), 42

---

**7.** See Exxon Corp. v. Hunt, 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986) (reviewing CERCLA's legislative history). Two different bills dealing with the toxic waste problem proceeded through the House and Senate. In the Senate, there were major last-minute alterations, including the deletion of provisions establishing liability for personal injury and economic loss caused by the release of hazardous substances. The House bill was amended generally to conform with the Senate bill and, as amended, was the version enacted. As a result, the committee reports and other materials dealing with CERCLA are of limited value in interpreting the statute, which in its final form reflected legislative judgments that differed substantially from those incorporated in the earlier House and Senate bills. See generally Senate Committee on Environment and Public Works, 97th Cong., 2d Sess., A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund) (Comm. Print 1983).

In 1986, Congress reauthorized and amended CERCLA, providing some clues to the meaning of the 1980 legislation. See Superfund Amendments and Authorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613. Very little of the new legislation is directly relevant to the issues presented in this case. Therefore, unless otherwise noted, references to CERCLA will be to the unamended codification of the statute at 42 U.S.C. §§ 9601 et seq. (1982).

**8.** Section 107 provides for the recovery from covered persons of the following costs:

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

CERCLA §§ 107(a)(4)(A)–(C), 42 U.S.C. §§ 9607(a)(4)(A)–(C). An action for natural resource damages may be brought only by the United States or a state government. Id. § 107(f), 42 U.S.C. § 9607(f). Response actions taken by the United States or a state government are presumed to be "not inconsistent with the national contingency plan" under section 107(a)(4)(A); the defendant has the burden of proving otherwise. Conversely, private plaintiffs have the burden of proving that their response actions are "consistent with the national contingency plan" under section 107(a)(4)(B). See United States v. Ward, 618 F.Supp. 884, 899 (E.D.N.C.1985); United States v. Northeastern Pharmaceutical & Chemical Co., 579 F.Supp. 823, 851 (W.D.Mo.1984).

**9.** Removal actions are defined as

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as

U.S.C. § 9601(25). Generally, removal actions are those intended for the short-term abatement of toxic waste hazards, while remedial actions are those intended to restore long-term environmental quality. *See* CERCLA §§ 101(23)–(24), 42 U.S.C. §§ 9601(23)–(24); *Shore Realty,* 759 F.2d at 1040; *Artesian I,* 605 F.Supp. at 1359–61; *see also* 40 C.F.R. § 300.68(a) (1986) ("[r]emedial actions are those responses to releases that are consistent with permanent remedy"). Removal or remedial actions taken by the federal government, state governments, and private parties are to be conducted within guidelines established by the EPA's National Contingency Plan,[10] promulgated pursuant to section 105 of CERCLA, 42 U.S.C. § 9605.

■ In the instant case, Artesian's prima facie claim for cost recovery under section 107(a)(4)(B) consists of the following elements:

(1) The County must fall within one of the four categories of "covered persons." CERCLA § 107(a), 42 U.S.C. § 9607(a).

(2) There must have been a release or a threatened release of hazardous substances from the Site. *Id.* § 107(a)(4), 42 U.S.C. § 9607(a)(4); *see id.* §§ 101(14), (22), 42 U.S.C. §§ 9601(14), (22).

(3) The release or threatened release must have caused Artesian to incur costs. *Id.* § 107(a)(4), 42 U.S.C. § 9607(a)(4).

(4) Artesian's costs must be necessary costs of response. *Id.* § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B); *see id.* §§ 101(23)–(25), 42 U.S.C. §§ 9601(23)–(25).

(5) Artesian's response actions must be consistent with the National Contin-

> may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief Act of 1974.

CERCLA § 101(23), 42 U.S.C. § 9601(23). Remedial actions are defined as

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare. The term does not include offsite transport of hazardous substances, or the storage, treatment, destruction, or secure disposition offsite of such hazardous substances or contaminated materials unless the President determines that such actions (A) are more cost-effective than other remedial actions, (B) will create new capacity to manage, in compliance with subtitle C of the Solid Waste Disposal Act, hazardous substances in addition to those located at the affected facility, or (C) are necessary to protect public health or welfare or the environment from a present or potential risk which may be created by further exposure to the continued presence of such substances or materials.

*Id.* § 101(24), 42 U.S.C. § 9601(24).

10. The current version of the NCP appears at 40 C.F.R. §§ 300.1 *et seq.* (1986).

gency Plan.[11] *Id.* § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B).

The parties dispute the existence of each of these elements.[12]

## III. CROSS MOTIONS FOR SUMMARY JUDGMENT

### A. Standard of Review

The County has moved pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss Artesian's amended complaint for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment. Because the parties have referred to matters outside of the pleadings, Rule 12(b) requires that the motion to dismiss be treated as one for summary judgment and disposed of as provided in Fed.R.Civ.P. 56. Artesian has moved pursuant to Rule 56(c) for partial summary judgment on liability.

Rule 56(c) permits a court to render summary judgment if it is "show[n] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Nevertheless, "when a motion is made and supported, the nonmoving party must produce specific facts showing that there is a genuine issue for trial, rather than resting upon the assertions of pleading." *Jersey Central Power & Light Co. v. Township of Lacey,* 772 F.2d 1103, 1109 (3d Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986); *see Celotex Corp. v. Catrett,* — U.S. ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Assertions in the form of legal conclusions are insufficient to create issues of material fact that would preclude summary judgment. *Securities & Exchange Comm'n v. Bonastia,* 614 F.2d 908, 914 (3d Cir.1980).

The parties here have presented cross motions for summary judgment.[13] To prevail on its motion, Artesian must show that there is no genuine issue of material fact as to the existence of each of the five elements of liability under section 107(a) of CERCLA and also as to the nonexistence of any defense under section 107(b). Conversely, the County must show for purposes of its motion that there is no genuine issue of material fact as to the nonexistence of at least one of the five elements of Artesian's prima facie case or, alternatively, as to the existence of a defense.[14]

The Court will address *seriatim* the elements of Artesian's prima facie case and the County's possible defense.

### B. Covered Person

Section 107(a) of CERCLA sets out four categories of covered persons who

---

**11.** Artesian's argument that consistency with the NCP is not properly an element of its prima facie case under section 107, and that it therefore need not establish such consistency to be entitled to partial summary judgment on liability, will be addressed at text accompanying notes 42–44 *infra.* Artesian does not dispute that items (1) through (4) are elements of its prima facie case.

**12.** However, the County concedes, as it must, that it is a "person," CERCLA § 101(21), 42 U.S.C. § 9601(21), that the Site is a "facility," *id.* § 101(9), 42 U.S.C. § 9601(9), and that a "hazardous substance" has been released into the Upper Potomac Aquifer, *id.* § 101(14), 42 U.S.C. § 9601(14). In addition, the County does not raise any of the section 107(b) defenses except insofar as they relate to the asserted lack of causal connection between the release of hazardous substances from the Site and the incurrence of costs by Artesian.

**13.** The Court is mindful that

[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

*Rains v. Cascade Industries,* 402 F.2d 241, 245 (3d Cir.1968).

**14.** The County does not assert, for purposes of its motion, the existence of a section 107(b) defense. *See supra* 1278.

may be held liable for the release of a hazardous substance:

> (1) the owner and operator of ... a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who ... arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person ..., and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person....

42 U.S.C. § 9607(a). Because the County concededly is neither a generator nor a transporter of hazardous substances, it cannot be held liable under subsections (3) and (4) of section 107(a). Subsections (1) and (2), however, apply to owners and operators of hazardous waste facilities. Subsection (1) applies to all current owners and operators regardless of whether they owned or operated the facility when hazardous substances were disposed of there; subsection (2) applies to former owners and operators, but only if they owned or operated the facility at the time of hazardous waste disposal. *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985); *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 578 (D.Md. 1986).

The Site was used as a waste disposal facility from 1960 until 1968.[15] The County notes, however, that even though it purchased the Site in 1962, title to the land was held by the State of Delaware throughout the period of disposal activity.[16] Moreover, the County did not directly control the disposal of wastes at the Site but instead retained various third-party operators. The County consequently asserts that it neither owned nor operated the Site when hazardous substances allegedly were disposed of there, and cannot be held liable under section 107(a)(2).

■ In 1974, after the Site was closed, title was transferred from the State to the County, where it has remained. *See* 9 *Del.C.* § 317. For purposes of liability under section 107(a)(1), the County is therefore the current owner of the Site.[17] Artesian argues in addition that the County has always been the operator of the Site because it is vicariously responsible for the actions of the third parties it retained to manage day-to-day disposal activities at the Site. *See Idaho v. The Bunker Hill Co.*, 635 F.Supp. 665, 671–72 (D.Idaho 1986); *United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823, 848–49 (W.D.Mo.1984).

■ The Court does not need to reach the issue of whether the County is the current operator of the Site, however, in order to find that the County is a covered person within the meaning of section 107(a)(1). Although section 107(a)(1) speaks in terms of "the owner and operator of ... a facility," a party need not be both an owner and an operator to be held liable under that provision. In *Maryland Bank & Trust*, 632 F.Supp. at 578, the court observed:

> It is unclear from its face whether subsection (1) holds liable both owners and

---

**15.** The County does not concede that the wastes disposed of at the Site were hazardous substances within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14). As a landfill, however, the Site falls within CERCLA's definition of a "facility" regardless of whether hazardous substances were disposed of there. *Id.* § 101(9)(A), 42 U.S.C. § 9601(9)(A).

**16.** Under Delaware law prior to 1974, land owned by a county was titled to the State for use by the county. 9 *Del.C.* § 317 (amended 1974).

**17.** The County notes that the 1962 deed conveying the Site to the State for use by the County provided that the parcel was to be used "solely for public park purposes" after landfill operations ceased. From this, the County argues that the parcel is public land, owned by the State, that cannot be conveyed without the specific approval of the General Assembly. *See 7 Del.C.* §§ 4518(a), (d). The County fails to point out, however, that the legislature effectively approved the conveyance to the County of this assertedly State-owned land when it amended 9 *Del.C.* § 317 in 1974.

operators or only parties who are both owners and operators. This ambiguity stems in large part from the placement of the definite article "the" before the term "owner" and its omission prior to the term "operator." Proper usage dictates that the phrase "the owner and operator" include only those persons who are both owners and operators. But by no means does Congress always follow the rules of grammar when enacting the laws of this nation.... Misuse of the definite article is hardly surprising in a hastily conceived compromise statute such as CERCLA, since members of Congress might well have had no time to dot all the i's or cross all the t's.

Other courts, as well, have not hesitated to hold liable under section 107(a)(1) current owners who were not current operators and vice versa. *See Shore Realty,* 759 F.2d at 1044; *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 186–87 (W.D.Mo.1985); *Northeastern Pharmaceutical,* 579 F.Supp. at 848 n. 29. The County is a covered person under section 107(a).

### C. Release or Threatened Release

Artesian must demonstrate there has been a release or threatened release of hazardous substances from the Site.[18] The fact that hazardous substances are present in the groundwater around the Site is not in dispute. The County insists, however, that the concurrent release of hazardous substances from the nearby DS & G Landfill casts doubt on whether the contami-

nants detected in the vicinity of the Site in fact flow from the Site.

Artesian offers several studies and analyses demonstrating that hazardous substances are present in the groundwater and in sediment near the Site.[19] In response, the County submits the affidavit of Walter M. Leis, a geologist familiar with the Site and the County's efforts to remedy the groundwater pollution problem. *See* Docket Item ("Dkt.") 24A, Ex. B. Leis, disagreeing with the clear inference arising from the various analyses,[20] asserts that "it cannot be stated to any reasonable degree of probability" that the toxic wastes identified in water samples taken beyond the boundaries of the Site are located within or emanate from the Site. *Id.* at ¶ 5. The County argues that the Leis affidavit is particularly probative in view of the DS & G Landfill and because Artesian has offered no evidence suggesting that hazardous substances were actually disposed of at the Site.

■ The Court finds nevertheless that Artesian has made a showing of a release or threatened release of hazardous substances from the Site sufficient to satisfy its burden on summary judgment. First, once Artesian produced facts in support of its summary judgment motion, the County could not rely on simple contrary assertions to preserve a genuine issue for trial. *See Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Jersey Central Power & Light Co. v.*

---

**18.** CERCLA requires that the County own a facility *"from which* there is a release, or a threatened release." CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4) (emphasis added). A "release" includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." *Id.* at § 101(22), 42 U.S.C. § 9601(22).

**19.** *See* County's Request for Emergency Discharge of Landfill Generated Contaminants, Docket Item ("Dkt.") 164, Ex. E; New Castle County Dep't of Public Works water analyses of recovery well discharges, Dkt. 164, Exs. I & J; EPA Remedial Action Master Plan for Army Creek Landfill, Dkt. 164, Ex. L; Apgar & Baedecker, Hydrogeochemical Studies at a Landfill in Delaware, Dkt. 175, Ex. C. Some of these

analyses simply assume that the contaminants detected near the Site emanate from the Site. *See* Dkt. 164, Ex. E, at 1; Dkt. 175, Ex. C, at 128. *But see* Dkt. 164, Ex. L, at ES–1 ("The two sites [Army Creek Landfill and DS & G Landfill] are so close that resulting contamination of local groundwater aquifers most likely results from the combined effect of both sites.").

**20.** The Leis affidavit specifically takes issue only with the November 9, 1983 water analysis prepared by the County's Department of Public Works, *see* Dkt. 4, Ex. H; Dkt. 164, Ex. I, arguing that it is "scientifically insufficient to establish the existence of [hazardous substances] in the reported quantities in the landfill area." Dkt. 24A, Ex. B, at ¶ 6. Artesian's other submissions, see *supra* note 19, are unrefuted.

*Township of Lacey,* 772 F.2d 1103, 1109 (3d Cir.1985); *Securities & Exchange Comm'n v. Bonastia,* 614 F.2d 908, 914 (3d Cir. 1980). Mere expert opinion as to the weight of the moving party's evidence, without an offer of independent facts by the nonmoving party, cannot under the facts of this case be permitted to defeat summary judgment. *See Seal Tite Corp. v. Ehret, Inc.,* 589 F.Supp. 701, 705–06 (D.N.J.1984). For reasons that seem all too clear, the County did not take advantage of the opportunity to create a triable issue by offering independent evidence that no hazardous substances are present within the boundaries of the Site.

Second, Artesian is itself under no burden to show that hazardous substances were disposed of at the Site.[21] As a landfill, the Site falls within CERCLA's definition of a "facility" regardless of whether hazardous substances were deposited there. CERCLA § 101(9)(A), 42 U.S.C. § 9601(9)(A). Artesian need only demonstrate, as I believe it has, that contaminants were released from the Site.

Finally, and most importantly, the policies underlying section 107 conflict with the County's demand that Artesian prove beyond dispute that the contaminants found near the Site actually flow from the Site. From a technological standpoint, Artesian's ability to "fingerprint" the leachate in the groundwater as emanating from either the Site or the DS & G Landfill is exceedingly doubtful. To impose such a requirement might permit the owners and operators of both facilities to avoid financial responsibility for the cleanup, and would thus eviscerate section 107. *Cf. United States v. Wade,* 577 F.Supp. 1326, 1332–33 (E.D.Pa.1983) (section 107 plaintiff need not prove that wastes released from a site are those of a particular generator defendant). The Court finds that there is no genuine issue of material fact as to the existence of a release or threatened release of hazardous substances from the Site.

### D. Causation

■ CERCLA's strict liability scheme does not diminish the necessity of demonstrating a causal connection between a release or threatened release and the incurrence of costs by a section 107 plaintiff.[22] *See New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044 & n. 17 (2d Cir.1985); *Idaho v. The Bunker Hill Co.,* 635 F.Supp. 665, 674 (D.Idaho 1986). Artesian must therefore show that it incurred costs as a result of the release or threatened release of hazardous substances from the Site. The County challenges the existence of causation on two levels. First, the County argues that Artesian cannot make the required showing that "but for" the release or threatened release from the Site, it would not have incurred costs. Second, the County asserts that under state law, Artesian had no protectable interest in withdrawing more than 2.0 MGD from the Llangollen Wellfield. The Court believes these contentions to be without merit and accordingly finds that the release or threatened release of contaminants from the Site caused Artesian to incur costs.

### 1. Causation in Fact

In 1973, DNREC directed Artesian to limit its withdrawals from the Llangollen Wellfield to 2.0 MGD, a restriction that remains in place. The pumping restriction was initially imposed in order to stem the threat of contamination from the Site and to permit the operation of the County's recovery well system. The County argues, however, that several other factors have since superseded the release or threatened release of contaminants from the Site as reasons for the continued 2.0 MGD restriction. These factors include the migration

---

21. Artesian has, in fact, introduced an analysis indicating that hazardous substances are present in the discharge from a recovery well that is actually located within the boundaries of the Site. *See* New Castle County Dep't of Public Works water analyses of recovery well discharges, Dkt. 164, Exs. I & J (analysis of Outfall No. 017). This suggests strongly, although perhaps not conclusively, that hazardous substances were disposed of at the Site.

22. CERCLA requires that there be a release or threatened release *"which causes* the incurrence of response costs." CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4) (emphasis added).

of pollutants from the DS & G Landfill, the threat of saltwater intrusion from the Delaware River, and DNREC's "top of the aquifer" water supply management policy.[23]

Because the DNREC restriction was imposed before the DS & G Landfill and saltwater intrusion factors were known, Artesian responds that at least some of its costs were incurred as a direct result of the release or threatened release from the Site. The County insists that regardless of when the restriction was imposed, Artesian incurred none of its claimed costs before the superseding factors were discovered.[24] The Court does not need to address the issue of timing, however, to find that the release or threatened release from the Site was the cause in fact of Artesian's costs.

■ The "but for" rule of causation upon which the County relies is inadequate where, as here, two or more causes have concurred to bring about an event, and any one of them, operating alone, would have been sufficient to cause the identical result. I hold that a broader rule must control: the defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing it about. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* § 41, at 267 (5th ed.

1984); *see Restatement (Second) of Torts* §§ 431, 433 (1965). Stated another way,

> [w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event.

*Prosser and Keeton, supra,* § 41, at 268. In appropriate circumstances, this formulation must be applied to determine causation issues under CERCLA.[25] Thus, if the release or threatened release of contaminants from the Site was a substantial factor in causing Artesian to incur costs, the County may not escape liability merely because other causes—the DS & G Landfill, saltwater intrusion, DNREC's aquifer management policy—have contributed to the result.

■ The evidence is uncontradicted that the threat of contamination from the Site was initially the sole factor and remains a substantial factor in the continued pumping restriction on the Llangollen Wellfield. I therefore find as a matter of law that the release or threatened release of hazardous

---

23. The affidavit of Michael A. Apgar, a DNREC supervisor responsible for issuing water withdrawal allocation permits, concludes that

while the contamination problem at the Army Creek Landfill was initially perceived as the reason to limit the withdrawal rates at the Llangollen Well Field to Artesian's currently authorized 2.0 mgd withdrawal rate, other factors would preclude an increase in the withdrawal rate. These factors include a moratorium on increased pumpage to limit salt-water intrusion and the threat of migration of contaminants from the DS & G Landfill site.

Dkt. 169, Ex. A, at ¶ 31. Apgar states that the 1973 pumping restriction "occurred prior to the threat of contamination from the DS & G Landfill and prior to the current appreciation of the threat of saltwater intrusion." *Id.* at ¶ 26. In addition, Apgar refers to DNREC's policy of issuing allocation permits so as not to allow water levels in pumping wells to fall below the top of the aquifer. *Id.* at ¶ 10.

Artesian's water allocation permits for 1980 and 1985 both mention saltwater encroachment as a factor limiting permissible withdrawals from the Llangollen Wellfield. Dkt. 159, at A–2, A–5.

24. The DS & G Landfill was closed in 1976 because of the threat of groundwater contamination. *See* Apgar Affidavit, Dkt. 169, Ex. A, at ¶ 16. In 1977, saltwater intrusion caused the salt concentration in one of Artesian's wells to exceed the drinking standard. *See* Deposition of Bangalore T. Lakshman, Dkt. 75, at 303–11. The County asserted in its briefs that Artesian incurred no costs before 1978, but conceded at oral argument that the costs of monitoring and evaluation were incurred much earlier.

25. The Court, in a question of first impression in a CERCLA case, applies the substantial factor rule of causation as a matter of federal common law. The cases agree that Congress in enacting CERCLA intended to grant authority to create federal common law in determining liability issues arising under the statute. *See United States v. New Castle County,* 642 F.Supp. 1258, 1267 (D.Del.1986); *United States v. A & F Materials Co.,* 578 F.Supp. 1249, 1255 (S.D.Ill.1984); *United States v. Chem-Dyne Corp.,* 572 F.Supp. 802, 809 (S.D.Ohio 1983); *see also* 126 Cong.Rec. H11,787 (daily ed. Dec. 3, 1980) (statement of Rep. Florio).

substances from the Site was the cause in fact of Artesian's costs.

## 2. Protectable Interest

In *Artesian Water Co. v. New Castle County*, C.A. No. 5106, slip op. at 7–13 (Del.Ch. Aug. 4, 1983), Vice-Chancellor Hartnett addressed the County's argument that under Delaware law, Artesian had no protectable interest in withdrawing more than 2.0 MGD from the Llangollen Wellfield. Artesian had based its claim for damages and injunctive relief on a nuisance theory of liability, and the County moved for summary judgment.[26] Vice-Chancellor Hartnett held that Artesian's claim to a protectable interest in withdrawing more than 2.0 MGD depended on whether the County's groundwater recovery program could be considered a reasonable competing use of the aquifer. *Id.* at 8–11.

The Chancery Court began by noting that under Delaware law an individual's right to the use of groundwater is limited to a reasonable use, which must be judged by its effect on the rights of others who reasonably use the same water. *Id.* at 8–9 (citing *MacArtor v. Graylyn Crest III Swim Club*, 41 Del.Ch. 26, 187 A.2d 417, 419 (1963)). Although the court held that "[p]ollution of the groundwater cannot be characterized as a reasonable competing use," the County's groundwater recovery program, designed to avoid the spread of contaminants, "may, in fact, be a reasonable competing use of the aquifer." *Id.* at 10–11. If so, an accommodation of the County's use and Artesian's use would be necessary.

Vice-Chancellor Hartnett then turned to Artesian's claim that its use in excess of 2.0 MGD was reasonable as a matter of law. In 1969, DNREC promulgated water use regulations providing that:

The conditions of these Regulations shall not be retroactive and any person making a reasonable beneficial use of the water resources or public subacqueous lands of the State who has not obtained approval for such use prior to the adoption of these Regulations shall have such use protected and regulated in the same manner as any new application.

*Id.* at 12 (quoting DNREC Regulation I, § 2.05 (1969)). The court held that under the regulations, Artesian's 1969 use of 2.35 MGD "was grandfathered (or accepted as approved without former formal application and approval by the Commission) if determined to be a reasonable beneficial use." *Id.* Noting that the State had never determined that Artesian's use of 2.35 MGD was reasonable, the court concluded:

The granting of grandfather rights without a formal application being filed or a hearing held or a finding that the use was a reasonable use of the available water, necessarily limits grandfather rights to a reasonable use of the groundwater. The reasonable use may be, of necessity, restricted or even diminished should conditions, not foreseen in 1969, require a diminution of plaintiff's reasonable use of the water, in order to accommodate the rights of others.

Whether plaintiff's rights to an otherwise reasonable water use can be restricted due to the necessity of limiting the amount of water taken from the aquifer because of pollution caused by the County's landfill depends on whether such a diminution would be reasonable under all the facts and circumstances. Not all the facts and circumstances are presently before the Court. A critical factual issue is whether the County knew or should have known that the operation of the landfill would likely result in water pollution. Facts concerning the County's knowledge or expectations are critical because, as will be shown, the County may not be strictly liable for the pollution.

---

26. The court concluded, *inter alia,* that the County was protected by sovereign immunity from a claim for money damages, but that Artesian's claim for injunctive relief could proceed. This Court's conclusion in *Artesian I* that sovereign immunity did not protect the County from a CERCLA suit is not inconsistent with Vice-Chancellor Hartnett's opinion. Judge Stapleton expressly held that federal law under CERCLA preempted state-law sovereign immunity. *See Artesian I,* 605 F.Supp. at 1353–55.

The plaintiff, therefore, has a protectable right of reasonable use of the groundwater and the County is not entitled to summary judgment on this issue. The plaintiff, however, does not have an absolute right to use water in excess of 2.0 mgd. and it therefore is not entitled to summary judgment on this issue.

*Id.* at 13.

■ Vice-Chancellor Hartnett's opinion, fairly characterized, left open the issue of whether the County's groundwater recovery program was a reasonable competing use of the aquifer. This Court is therefore free to decide the issue.[27] Rather than hold for all purposes that the County's use is or is not a reasonable competing use under Delaware law, however, the Court will make the determination only in the narrow context of causation in a CERCLA action. Because the County's use of groundwater directly results from the release or threatened release of hazardous substances that is the subject of this lawsuit, I hold for purposes of this CERCLA action that the groundwater recovery program cannot be considered a reasonable competing use. Artesian therefore has a protectable interest in withdrawing more than 2.0 MGD from the Llangollen Wellfield.

**E. Response Costs**

Artesian must show that the costs it has incurred or will incur are "necessary costs of response." CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B); *see id.* §§ 101(23)–(25), 42 U.S.C. §§ 9601(23)–(25). The cases firmly establish that the incurrence of response costs is an essential element of a prima facie case under section 107(a). *See, e.g., City of New York v. Exxon Corp.*, 633 F.Supp. 609, 617–18 (S.D.N.Y.1986); *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 608 F.Supp. 1272, 1275 (N.D.Cal.1985);

*Bulk Distribution Centers v. Monsanto Co.*, 589 F.Supp. 1437, 1451–52 (S.D.Fla. 1984); *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1429 (S.D.Ohio 1984); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1143 (E.D.Pa.1982).

Artesian has incurred or will incur three kinds of costs that it claims are response costs cognizable under CERCLA: (1) costs of monitoring and evaluating the impact on the Llangollen Wellfield of the release of hazardous substances from the Site; (2) costs related to the loss of capacity of Artesian's wells since pumping restrictions were imposed in 1973; and (3) costs of obtaining temporary and permanent alternative water supplies. For the reasons that follow, the Court finds that only the expenses of monitoring and evaluation are response costs within the meaning of CERCLA. The other costs are all economic losses for which the statute provides no private remedy. The County's motion for summary judgment must therefore be granted with respect to all of Artesian's claims except the claim for recovery of monitoring and evaluation expenses.

**1. Response Costs and Economic Losses**

■ Congress in enacting CERCLA clearly manifested an intent not to provide compensation for economic losses or for personal injury resulting from the release of hazardous substances. As reported from committee, the leading Senate Superfund bill, S. 1480, provided a private cause of action for

> all damages for economic loss or loss due to personal injury or loss of natural resources resulting from such a discharge, release, or disposal, including—

27. As applied by Chancellor Seitz in *MacArtor v. Graylyn Crest III Swim Club*, 41 Del.Ch. 26, 187 A.2d 417 (1963), the factors in determining the reasonableness of competing uses are (1) the nature of the competing uses; (2) the comparative number of users; and (3) the volume of water withdrawn by one user as compared to the volume required by other users. *Id.* 187 A.2d at 420.

The County argues that the reasonableness issue was implicitly decided in the County's favor when DNREC issued water allocation permits in 1980 and 1985 that limited Artesian's withdrawals to 2.0 MGD. *See* Dkt. 159, at A–1 to A–6.

(A) any injury to, destruction of, or loss of any real or personal property, including relocation costs;

(B) any loss of use of real or personal property;

(C) any injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss;

(D) any loss of use of any natural resources, without regard to the ownership or management of such resources;

(E) any loss of income or profits or impairment of earning capacity resulting from personal injury or from injury to or destruction of real or personal property or natural resources, without regard to the ownership of such property or resources;

(F) all out-of-pocket medical expenses, including rehabilitation costs or burial expenses, due to personal injury; and

(G) any direct or indirect loss of tax, royalty, rental, or net profits share revenue by the Federal Government or any State or political subdivision thereof, for a period of not to exceed one year.

S. 1480, 96th Cong., 2d Sess. §§ 4(a)(2)(A)–(G). The version of S. 1480 debated on the Senate floor, however, was a substitute bill that differed markedly from that reported out of committee. The substitute version of S. 1480 included a liability section that is identical to the provision Congress ultimately enacted. The Chairman of the Senate Environment and Public Works Committee noted that the substitute contained "many concessions from the original bill reported last summer" and that "[w]e have deleted the Federal cause of action for medical expenses or property or income loss." 126 Cong.Rec. S14,964 (daily ed. Nov. 24, 1980) (statement of Sen. Randolph).

As Judge Stapleton noted, this legislative history makes clear that "Congress, in enacting CERCLA, intended to provide a vehicle for cleaning up and preserving the environment from the evils of improperly disposed of hazardous substances rather than a new font of law on which private parties could base claims for personal and property injuries." *Artesian I*, 605 F.Supp. at 1357 n. 10; *see Exxon Corp. v. Hunt*, 475 U.S. 355, 106 S.Ct. 1103, 1108, 89 L.Ed.2d 364 (1986) ("Superfund money [is not] available to compensate private parties for economic harms that result from discharges of hazardous substances"). Artesian's claims for cost recovery must therefore be viewed in light of the fundamental, if elusive, distinction between response costs and economic losses.[28]

### 2. Monitoring and Evaluation Expenses

Artesian's first item of claimed response costs is the $60,000 it expended to monitor and evaluate the impact on the Llangollen Wellfield of the release of hazardous substances from the Site.[29] The County argues that this otherwise valid claim is premature unless further response actions have been taken. In *Bulk Distribution Centers v. Monsanto Co.*, 589 F.Supp. 1437 (S.D.Fla.1984), on which the County relies, the court held:

Congress enacted CERCLA to promote and supervise the clean up of hazardous releases, not just to study them; the Act requires action before a claimant may seek its protection. Feasibility studies and clean-up proposals are important first steps in neutralizing a toxic spill, but until someone applies the studies and executes the plan, the pollution threat remains. For this reason, CERCLA requires a claimant to start cleaning up a release before it can recover its expenses. In this way, the Act provides an

---

**28.** CERCLA's predictable failure to define the term "response costs" makes the Court's task more difficult. The term "response" is defined only as "remove, removal, remedy, and remedial action," CERCLA § 101(25), 42 U.S.C. § 9601(25); these latter terms are defined at length in §§ 101(23)–(24), 42 U.S.C. §§ 9601(23)–(24). *See supra* note 9.

**29.** CERCLA defines removal actions to include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances into the environment." CERCLA § 101(23), 42 U.S.C. § 9601(23).

incentive to arrest a spill, for without identifiable progress, a claimant may not seek compensation for its response costs under section 9607(a)(4)(B).

*Id.* at 1452. Some authority exists for this view.[30] *See, e.g., United States v. Price,* 577 F.Supp. 1103, 1110 (D.N.J.1983); *State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1315–16 (N.D.Ohio 1983).

■■■ Although the rationale suggested by the court in *Bulk Distribution Centers* is attractive, the only appellate decision on the issue reached the opposite conclusion. In *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887 (9th Cir.1986), the court held that the distinction between investigatory costs and actual cleanup costs is "immaterial" because CERCLA expressly provides for recovery of the costs of monitoring, assessment, and evaluation. *Id.* at 892 (citing CERCLA § 101(23), 42 U.S.C. § 9601(23)). I believe that the reasoning in *Wickland* is more persuasive and therefore hold that the County is liable for Artesian's monitoring and evaluation expenses even if Artesian has incurred no further response costs cognizable under CERCLA.

### 3. Loss of Well Capacity

■■■ Artesian's second item of claimed response costs is the $600,000 of losses resulting from the idling of property and equipment since pumping restrictions were imposed on Artesian's wells in 1973. Because CERCLA provides no private cause of action for economic losses, this claim is beyond the scope of the statute. *See Artesian I,* 605 F.Supp. at 1357 n. 10. The County is therefore not liable for the costs associated with Artesian's loss of well capacity.[31]

### 4. Provision of Alternative Water Supplies

■■■ Artesian's last (and by far its largest) item of claimed response costs is the approximately $10 million cost of obtaining temporary and permanent alternative water supplies ("AWS") for its customers. At first glance, this claim may simply appear to be for economic losses rather than for response costs, and hence beyond the reach of CERCLA. The statute, however, expressly defines both removal action and remedial action as including "provision of alternative water supplies." CERCLA §§ 101(23)–(24), 42 U.S.C. §§ 9601(23)–(24). The County concedes this point, but argues that the provision of AWS is not an appropriate response action under the circumstances here presented. I agree, and for the reasons that follow hold that the costs of providing AWS are recoverable under CERCLA only where the existing water supply is contaminated or is threatened with contamination. Because hazardous substances from the Site have not contaminated and no longer threaten to contaminate the Llangollen Wellfield, Artesian may not recover the costs of replacing its former source of water supplies.

### a. Provision of AWS and Natural Resource Damages

The County argues Artesian's claim for provision of AWS is more properly characterized as a claim for natural resource damages. Section 107 of CERCLA creates liability for "damages for injury to, destruction of, or loss of natural resources." CERCLA § 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C). "Natural resources" are defined to include "water, ground water, drinking water supplies, and other such resources belonging to, managed by, held

---

**30.** Some courts hold that monitoring and evaluation expenses, without more, are recoverable as response costs if expended by the federal government or by a state under section 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A). *See Colorado v. Asarco, Inc.,* 616 F.Supp. 822, 829 (D.Colo.1985); *New York v. General Electric Co.,* 592 F.Supp. 291, 298–99 (N.D.N.Y.1984).

**31.** In *Jones v. Inmont Corp.,* 584 F.Supp. 1425 (S.D.Ohio 1984), the court stated that the plain-

tiffs' claims for the costs of medical testing and for damages resulting from the loss of wells for drinking water and farming purposes "appear to meet the definition of 'removal' expressed in section 9601(23)." *Id.* at 1429. This unelaborated statement, however, squarely conflicts with Congress' expressed intent in deleting from CERCLA the private cause of action for personal injury and economic loss.

in trust by, appertaining to, or otherwise controlled by the United States ... any State or local government, or any foreign government." *Id.* § 101(16), 42 U.S.C. § 9601(16). The Upper Potomac Aquifer is a natural resource within the meaning of CERCLA.[32] Under the statute, however, actions for injury, destruction, or loss of a natural resource may be brought only by the federal government or a state. *Id.* § 107(f), 42 U.S.C. § 9607(f); *see generally Idaho v. The Bunker Hill Co.,* 635 F.Supp. 665, 674–75 (D.Idaho 1986). As a consequence, the County asserts that an action for natural resource damages by the State of Delaware is the sole available remedy in the case of injury to the aquifer.[33]

■ Nothing in CERCLA, however, indicates that governmental claims for natural resource damages under section 107(a)(4)(C) and private claims for provision of AWS under section 107(a)(4)(B) are mutually exclusive remedies. As one court has noted, "a great deal of overlap" between natural resource damages and the costs of remedial action can be expected. *United States v. Shell Oil Co.,* 605 F.Supp. 1064, 1084 n. 10 (D.Colo.1985). Indeed, the amount of recovery may be the same in both cases.[34] The Court therefore concludes that the existence of a claim for natural resource damages does not by itself preclude Artesian's claim for provision of AWS.

### b. Contamination or Threatened Contamination of the Existing Water Supply

Although a private party may maintain an action to recover the costs of providing AWS despite the possibility of a parallel claim for natural resource damages, the policies underlying CERCLA indicate that provision of AWS is an appropriate response action only where the existing water supply is contaminated or threatened with contamination. The EPA's interpretation of the statute and of the NCP regulations it has promulgated thereunder lends significant support to this view.

■ The primary goal of CERCLA is facilitating the prompt cleanup of hazardous waste sites. *See Exxon Corp. v. Hunt,* 475 U.S. 355, 106 S.Ct. 1103, 1108, 89 L.Ed.2d 364 (1986); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1040 (2d Cir. 1985); *Artesian I,* 605 F.Supp. at 1356 (citing *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1142–43 (E.D.Pa. 1982)). It is no surprise, therefore, that CERCLA's definitions of removal action and remedial action generally list responses that involve cleanup or treatment of the hazardous waste site itself. *See* CERCLA §§ 101(23)–(24), 42 U.S.C. §§ 9601(23)–(24).[35] Section 101(23), however, defines removal actions to include "in addition" various responses designed instead to minimize public exposure to hazardous substances:

> security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title [federal investigations and monitoring], and any emergency assistance which may be provided under the Disaster Relief Act of 1974.

42 U.S.C. § 9601(23). Similarly, section 101(24) defines remedial actions to include some responses not strictly related to cleanup or treatment of the hazardous

---

**32.** Groundwater resources in Delaware are held in trust and managed by DNREC. *See* 7 *Del.C.* §§ 6001 *et seq.*

**33.** The State has brought no such claim against the County.

**34.** Under CERCLA § 107(f), 42 U.S.C. § 9607(f), natural resource damages may be measured either as the decrease in economic and aesthetic value of the resource or as the cost of restoration and rehabilitation. *Idaho v. The Bunker*

*Hill Co.,* 635 F.Supp. 665, 675–76 (D.Idaho 1986); *see also* 51 Fed.Reg. 27,681 *et seq.* (Aug. 1, 1986) (natural resource damage assessment regulations promulgated pursuant to CERCLA § 301(c), 42 U.S.C. § 9651(c)). The latter measure of natural resource damages may in some circumstances be equivalent to the cost of remedial action taken by a private party.

**35.** *See supra* note 9 for the text of these provisions.

waste site, such as "provision of alternative water supplies" and "permanent relocation of residents and businesses and community facilities." 42 U.S.C. § 9601(24).

The implication of the statutory language is that CERCLA contemplates provision of AWS only where necessary to minimize public exposure to hazardous substances; that is, in cases of actual or threatened contamination of existing water supplies. Other sources of Congress' intent support this conclusion. First, congressional supporters of a Superfund statute, in stressing the need for federal legislation, made numerous references in debates to the contamination of existing drinking water supplies with toxic wastes.[36] Second, the recent amendments to CERCLA for the first time give content to the term "alternative water supplies" by defining it as "drinking water and household water supplies." Superfund Amendments and Authorization Act of 1986, Pub.L. No. 99–499, § 101(f), 100 Stat. 1613, 1616 (to be codified at 42 U.S.C. § 9601(34)). According to the Senate committee report on the legislation,

> [t]his section makes it clear that household water must be replaced when this authority is invoked. The prompt provision of household water supplies should minimize the unfortunate situations in which citizens are bathing, washing clothes, and carrying out household chores with water contaminated by a release under this Act.

S.Rep. No. 11, 99th Cong., 1st Sess. 7 (1985). The focus of Congress' concern therefore was and remains public exposure to hazardous substances in tap water, not the replacement of water supplies unthreatened with contamination.[37] Finally,

the NCP regulations promulgated by EPA state as a general rule that provision of AWS is an appropriate removal action "where it will reduce the likelihood of exposure of humans or animals to contaminated water." 40 C.F.R. § 300.65(c)(8) (1986); *see also id.* § 300.68(j)(4) (actions listed in § 300.65(c) are appropriate remedial actions if "[i]n response to the threat of direct contact with hazardous substances").

■ The record before the Court admits of no dispute, and Artesian conceded at oral argument, that Artesian's water supply—the Llangollen Wellfield—is now free of actual or threatened contamination from the Site. For example, the EPA's recent Record of Decision for the Site notes that "[d]ue to the success of the groundwater recovery system operated by the County, along with the reduction in pumpage by Artesian Water Company, the contaminants emanating from Army Creek Landfill are not currently threatening drinking water supplies." Dkt. 185, Ex. B, at 8; *see* Affidavit of Michael A. Apgar, Dkt. 169, Ex. A, at ¶ 23 ("the induced movement of contaminants towards the Llangollen Well Field has been contained" by the creation of a groundwater divide). Of course, Artesian might eventually pump groundwater that is contaminated if permitted to withdraw water from the Llangollen Wellfield in excess of 2.0 MGD. The capacity to reach contaminated groundwater, however, does not justify provision of AWS in the absence of a threat to Artesian's current water supply. Artesian's provision of AWS is therefore not an appropriate response action under CERCLA, and the costs it has incurred or will incur are not "necessary costs of response" under section 107(a)(4)(B).

---

**36.** *See, e.g.,* 126 Cong.Rec. S14,942 (daily ed. Nov. 18, 1980) (statement of Sen. Stafford); *id.* at S14,963 (statement of Sen. Randolph); *id.* at S14,968 (statement of Sen. Stafford); *id.* at S14,-974 (statement of Sen. Mitchell); 126 Cong.Rec. H9154–55 (daily ed. Sept. 19, 1980) (statement of Rep. Florio); *id.* at H9166 (statement of Rep. Downey); *id.* at H9168 (statement of Rep. Stangeland).

**37.** The Court uses the 1986 amendments to shed light on the intent behind the 1980 statute with some hesitation. "Although we realize that con-

gressional hindsight is no substitute for legislative analysis generated during the period immediately preceding enactment of a bill, we do find the language of the recent conference report to have some force due to the aura of uncertainty that has surrounded this particular portion of the CERCLA scheme." *Dedham Water Co. v. Cumberland Farms Dairy,* 805 F.2d 1074, 1081 (1st Cir.1986) (construing CERCLA § 112(a), 42 U.S.C. § 9612(a), in light of the 1986 amendments).

This conclusion accords with the EPA's interpretation of the relevant CERCLA and NCP provisions, undertaken as part of the selection of its own remedial alternative for the Site. The groundwork for the EPA's interpretation was laid in a June 13, 1986 memorandum from Gene A. Lucero, Director of the EPA Office of Waste Programs Enforcement, to Steve Wassersug, Regional Director of the Hazardous Waste Management Division. *See* Dkt. 185, Ex. A. In response to questions posed by the regional office during the preparation of the NCP-mandated Feasibility Study for the Site,[38] Lucero advised that "provision of an alternate water supply is not warranted because the remedial action already in place, and which will remain in place, will protect the drinking water supply downgradient of the landfill." *Id.* at 2. He concluded that provision of AWS "to replace an, as yet, uncontaminated source of drinking water" would be unjustified. *Id.* at 3.

 The EPA adopted Lucero's position in its September 30, 1986 Record of Decision, issued one month after the Magistrate filed his recommendation. The Record of Decision followed completion of the Feasibility Study and a public review and comment period. *See* Dkt. 185, Ex. B. The community relations responsiveness summary appended to the Record of Decision states that

the position of the EPA is that replacement of aquifer capacity is not a goal for this CERCLA cleanup. The wellfield currently in use is being protected by the existing recovery well system, and other remedial measures recommended for this Site should prevent future contamination of the aquifer related to contamination from the landfill.

*Id.,* responsiveness summary at 6. The EPA thus declined to include provision of AWS among the federal government's chosen response actions at the Site.[39]

 Faced with the ambiguity arising from CERCLA's exclusion of a cause of action for economic losses, on one hand, and its express reference to provision of AWS, on the other, the Court must consider the EPA's interpretation of the statute. "An agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *see EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980); *Udall*

---

**38.** *See* 40 C.F.R. § 300.68(d) (1986) (requiring the lead agency to undertake a Remedial Investigation/Feasibility Study).

**39.** The Court notes that Artesian is not without an opportunity to challenge the EPA's selected remedy for the Site. Artesian may obtain judicial relief if it can show that the EPA's response falls short of the standards imposed by CERCLA. As a general rule, judicial review of agency action under CERCLA is not available until the EPA files suit against responsible parties to recover its response costs. *See Wheaton Indus. v. EPA,* 781 F.2d 354, 356 (3d Cir.1986); *Lone Pine Steering Comm. v. EPA,* 777 F.2d 882, 886 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). The 1986 amendments to CERCLA essentially codify this limit on review, with certain exceptions. Superfund Amendments and Authorization Act of 1986, Pub.L. No. 99–499, § 113, 100 Stat. 1613, 1650 (to be codified at 42 U.S.C. § 9613(h)).

One of the exceptions to the bar on pre-enforcement judicial review is for "citizens suits," newly authorized in the amendments. *See id.* § 206, 100 Stat. 1613, 1703–04 (to be codified at

42 U.S.C. § 9659). Such suits may be brought, *inter alia,* by any person alleging a failure by EPA to perform a nondiscretionary duty under CERCLA. According to the House committee report on the amendments,

[t]his section will enable interested communities to enforce the mandatory duties and requirements of the Act, as they pertain to response actions undertaken by EPA, Federal facilities, or responsible parties. The section provides a safeguard for citizens who have been unable to obtain redress from EPA, other Federal facilities, states or responsible parties.

H.Rep. No. 99–253(I), 99th Cong., 1st Sess. 108 (1985). Without deciding the issue, it appears that Artesian may therefore challenge in a citizens suit the adequacy of EPA's selected remedy, particularly its failure to provide AWS. Moreover, Artesian may pursue an administrative appeal if the EPA denies Artesian's claim against the Superfund for reimbursement of its response costs, and may seek judicial review if the claim is not granted on appeal. *See* CERCLA § 112(b), 42 U.S.C. § 9612(b); 40 C.F.R. §§ 305.10 *et seq.* (1986).

*v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The EPA has consistently interpreted CERCLA to limit provision of AWS to cases of actual or threatened contamination of existing water supplies. *See* 40 C.F.R. § 300.65(c)(8) (1986). Because the Court finds this view to be both reasonable and consonant with the intent of Congress, it is obliged to defer to the EPA's interpretation. *See Vineland Chemical Co. v. EPA*, 810 F.2d 402 at 409–410 (3d Cir.1987).

In light of the foregoing considerations, I conclude that the County is not liable for the costs of replacing Artesian's former source of water supplies.

### F. Consistency With the National Contingency Plan

CERCLA requires Artesian's response actions to be consistent with the NCP. CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B). Artesian vigorously argues, however, that consistency with the NCP is not properly an element of its prima facie case under section 107, and that it need not establish such consistency to be entitled to partial summary judgment on liability. Therefore, the argument goes, consistency with the NCP is relevant only in determining the amount of costs Artesian may recover. In the alternative, Artesian contends the consistency issue should be decided in light of the NCP in effect at the time its response actions were initiated, rather than in light of the current version.[40]

For the reasons that follow, I hold consistency with the NCP is an element of

Artesian's prima facie case under section 107 and that Artesian's response actions should be evaluated under the current NCP. I further find that Artesian's monitoring and evaluation expenses were incurred consistent with the NCP, but that Artesian's other response actions are as a matter of law inconsistent with the NCP's procedural and substantive requirements. The County's motion for summary judgment must therefore be granted with respect to all of Artesian's claims except the claim for recovery of monitoring and evaluation expenses.[41]

### 1. Consistency With the NCP and Summary Judgment

██ *The NCP plays a central role in the CERCLA scheme. Section 105 requires the promulgation of a revised NCP that includes, at a minimum,*

(2) methods for evaluating, including analyses of relative cost, and remedying any releases or threats of releases …

(3) methods and criteria for determining the appropriate extent of removal, remedy, and other measures …

. . . .

(7) means of assuring that remedial measures are cost-effective over the period of potential exposure. . . .

CERCLA § 105, 42 U.S.C. § 9605. The statute requires that "the response to and actions to minimize damage from hazardous substances releases shall, to the greatest extent possible, be in accordance with the provisions of the plan." [42] *Id.* Congress plainly contemplated that the NCP would be a standard against which re-

---

**40.** The EPA first promulgated the revised NCP on July 16, 1982. *See* 47 Fed.Reg. 31180 *et seq.* (July 16, 1982). The NCP was again revised, into its current form, on November 20, 1985. *See* 50 Fed.Reg. 47911 *et seq.* (Nov. 20, 1985).

**41.** The Court's holding that only the expenses of monitoring and evaluation are response costs within the meaning of CERCLA, *see* text accompanying notes 28–39 *supra*, provides an alternative ground for this conclusion.

**42.** The legislative history of CERCLA indicates that the NCP was regarded as a means of assuring that response actions would be both cost-effective and environmentally sound:

The plan will contain guidance on cost-effectiveness. Such guidelines are intended to assure that alternative remedial options are considered when planning cleanup actions at a particular site. This guidance will also provide both criteria and procedures for selection of the most cost-effective and environmentally sound alternative for remedying the site. This selection will require a balancing of a variety of factors, including cost and engineering, to achieve the health and environmental goals of the legislation.

126 Cong.Rec. S14,965 (daily ed. Nov. 24, 1980) (statement of Sen. Randolph).

sponse actions would be judged appropriate or inappropriate in the first instance, not merely a limit on the amount of damages recoverable from liable parties. I therefore hold that consistency with the NCP is an element of Artesian's prima facie case under CERCLA.

Two other considerations dictate this conclusion. First, Artesian's motion for partial summary judgment on liability is dependent on the existence of some recoverable damages; that is, some response costs incurred consistent with the NCP. Under Fed.R.Civ.P. 56(c), if a genuine issue exists as to whether the plaintiff has suffered any damages, summary judgment is improper. *See Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944); 6 J. Moore, *Moore's Federal Practice* ¶ 56.18. The Court must address consistency with the NCP at this juncture in order to determine whether Artesian is entitled to recover any of its response costs, and to avoid the risk of a pointless trial at some later date.

Second, the holding that consistency with the NCP is an element of Artesian's prima facie case was implicit in *Artesian I.* In that decision, Judge Stapleton granted the County's motion to dismiss, finding that the NCP required prior governmental approval of certain response actions.[43] *Artesian I*, 605 F.Supp. at 1357–62. This litigation has proceeded on the assumption that consistency with the NCP is a prerequisite to a finding of liability under CERCLA.

Artesian cites a number of cases in support of its contrary position. *See, e.g., United States v. Medley*, C.A. No. 7–86–252–3, slip op. at 7 (D.S.C. Nov. 4, 1986); *New York v. Shore Realty Corp.*, 648 F.Supp. 255, 263–65 (E.D.N.Y.1986); *United States v. Southeastern Pennsylvania Transp. Auth. (SEPTA )*, 24 Env't Rep. Cas. (BNA) 1860, 1864 (E.D.Pa. July 1, 1986); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 175 (W.D. Mo.1985); *United States v. Ward*, 618 F.Supp. 884, 898–99 (E.D.N.C.1985); *United States v. Mirabile*, 15 Envtl.L.Rep.

(Envtl.L.Inst.) 20,992 (E.D.Pa. Sept. 4, 1985); *Pinole Point Properties v. Bethlehem Steel Corp.*, 596 F.Supp. 283, 290 (N.D.Cal.1984); *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1430 (S.D.Ohio 1984); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1144 & n. 16 (E.D. Pa.1982). Most of these cases, however, simply stand for the proposition that consistency with the NCP cannot be resolved on the complaint alone and must instead await development of a factual record. *See Shore Realty*, 648 F.Supp. at 263 n. 5 ("the question of consistency may be resolved only at trial or after a factual record has been developed"); *SEPTA*, 24 Env't Rep. Cas. (BNA) at 1864 ("whether plaintiffs have complied with this [consistency] requirement is not relevant in a motion to dismiss"); *Pinole Point*, 596 F.Supp. at 290 ("This factual determination cannot be made on the basis of the pleadings but must await development of a factual record."); *Jones*, 584 F.Supp. at 1430 ("In light of the present procedural posture of the case ... we cannot say as a matter of law that the plaintiffs are not ... entitled [to recover response costs]."); *Stepan Chemical*, 544 F.Supp. at 1144 ("[T]his is not an issue that can be resolved on the pleadings. Rather, its disposition must await the development of a record."). In the cases dealing with summary judgment rather than with a motion to dismiss, the moving party either did not raise or did no more than merely deny the element of consistency. *See Medley*, slip op. at 7; *Conservation Chemical*, 619 F.Supp. at 175; *Ward*, 618 F.Supp. at 901; *Mirabile*, 15 Envtl.L.Rep. (Envtl.L.Inst.) at 20,993.

In contrast to the cases cited by Artesian, the parties here have compiled a sufficient factual record on the issue of consistency. The County has, moreover, detailed its allegations of inconsistency between Artesian's response actions and the NCP. The question is therefore ripe for

---

**43.** The part of the decision in *Artesian I* dealing with the need for governmental approval is no longer applicable to this case. *See* text accompanying notes 1–4 *supra.*

adjudication on the parties' cross motions for summary judgment.[44]

## 2. Applicability of the Current NCP

Artesian argues that consistency with the NCP should be determined in light of the NCP in effect at the time its response actions were initiated, rather than in light of the current version. The revised NCP, promulgated pursuant to section 105 of CERCLA, was first published on July 16, 1982. *See* 47 Fed.Reg. 31180 *et seq.* (July 16, 1982); 40 C.F.R. §§ 300.1 *et seq.* (1985). Prior to publication of the 1982 NCP, the applicable plan was that promulgated pursuant to section 311(c) of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1321(c). *See* 40 C.F.R. §§ 1510.1 *et seq.* (1982); *see also* CERCLA § 101(31), 42 U.S.C. § 9601(31) (defining national contingency plan). The 1982 NCP was revised on November 20, 1985. *See* 50 Fed.Reg. 47911 *et seq.* (Nov. 20, 1985); 40 C.F.R. §§ 300.1 *et seq.* (1986). Because most of Artesian's response actions apparently were initiated while the 1982 NCP or the FWPCA plan was in effect, Artesian contends that the 1985 NCP should not apply to its response actions.

Early decisions under CERCLA held that response costs incurred prior to publication of the 1982 NCP could be consistent with the NCP, even though the 1982 NCP had not yet been adopted when the claims for cost recovery were adjudicated. *See United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1114–16 (D.Minn.1982); *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1144 & n. 15 (E.D.Pa.1982). Cases decided after publication of the 1982 NCP built on the earlier rulings. In *United States v. Wade*, 20 Env't Rep.Cas. (BNA) 1849 (E.D.Pa. March 23, 1984), the court stated:

The generator defendants quite properly argue that one purpose in requiring that cleanup measures for which recovery is sought be consistent with the national contingency plan was to ensure evenhanded, responsible, and cost-efficient enforcement of CERCLA. Where they err is in concluding that to permit recovery for costs incurred prior to publication of the plan, but which are in fact consistent with the plan as subsequently published, would somehow undermine this policy. The only danger I foresee in permitting cleanup measures to go forward in the absence of a revised national contingency plan is one incurred by plaintiffs. The government will obviously encounter greater difficulty in assessing whether its costs will be recoverable before, as opposed to after, publication of the plan. Provided the national contingency plan is ultimately revised, as it was, and provided costs incurred either before or after publication are not inconsistent with the plan, which remains to be seen in this case, the Congressional concern with restraining agency action will be satisfied.

*Id.* at 1852–53; *see United States v. Shell Oil Co.*, 605 F.Supp. 1064, 1074–75 (D.Colo. 1985). This reasoning appears to imply that those who incur response costs run the risk that these costs will be held inconsistent with the NCP in effect when their CERCLA claims are evaluated.

Two recent decisions from the Ninth Circuit Court of Appeals, however, *NL Industries v. Kaplan*, 792 F.2d 896 (9th Cir. 1986), and *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887 (9th Cir.1986), found the 1982 NCP applicable to response costs incurred prior to publication of the 1985 NCP. The court noted its holding—

---

**44.** In *Mola Development Corp. v. United States*, 10 Ch. & Rad.W.Lit.Rep. 703 (C.D.Cal. July 30, 1985) [Available on WESTLAW, DCT database], the court stated:

Defendants also contend that they are entitled to dismissal because plaintiff's cleanup was not consistent with the national contingency plan. Whether defendants are correct or not is an issue of fact. The determination of such an issue is not appropriate on a motion to dismiss because it would require this court to make findings of fact while a motion

to dismiss is only a challenge to the face of the complaint. Clearly, plaintiff's CERCLA cause of action is sufficient to state a claim. Whether or not plaintiff might factually prevail is a matter more appropriately addressed at trial *or by way of summary judgment.*

*Id.* at 704 (emphasis added); *see Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 608 F.Supp. 1272, 1276 (N.D.Cal.1985); *D'Imperio v. United States*, 575 F.Supp. 248, 253 (D.N.J.1983).

that the NCP does not require prior governmental approval of response actions—would be the same regardless of which version of the NCP were applied. *NL Industries,* 792 F.2d at 898; *Wickland,* 792 F.2d at 891–92. Similarly, Artesian's response costs may be evaluated in light of either the 1982 NCP or the 1985 NCP with the same result.[45]

■ In accordance with *Wickland* and *NL Industries,* I hold on the facts of this case that consistency with the NCP should be determined in light of the NCP in effect at the time the response costs are incurred, not when the response actions are initiated or when the claims for cost recovery are evaluated. Although Artesian asserts most of its response actions were initiated before the 1985 NCP took effect, the fact remains that the great bulk of Artesian's costs—particularly the costs of constructing an interconnection with the Chester Water Authority—have yet to be incurred. Because I cannot speculate as to what the NCP will require at the time Artesian incurs these costs, I will assume the current version will remain applicable, and will evaluate Artesian's response ' actions in light of the 1985 NCP.

### 3. Artesian's Compliance With the 1985 NCP

The County argues that in carrying out its response actions, Artesian has failed to comply with the 1985 NCP in a number of respects. Specifically, the County contends Artesian's responses were selected without a prior Remedial Investigation and Feasibility Study; that Artesian provided for no public comment period; that Artesian's responses would fail to bring conditions at the Site into compliance with applicable federal, state, and local requirements; and that Artesian has made no showing that its responses are cost-effective.

■ For the following reasons, the Court finds as a matter of law that the provision of temporary and permanent alternative water supplies by Artesian is inconsistent with the NCP in the respects urged by the County. The County conceded at oral argument, however, that the detailed NCP provisions governing other response actions cannot reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances. Artesian's motion for partial summary judgment on liability will therefore be granted only with respect to Artesian's claim for recovery of monitoring and evaluation expenses.

### a. Remedial Investigation/Feasibility Study

Section 300.68(d) of the NCP requires a Remedial Investigation/Feasibility Study ("RI/FS") to precede remedial action under CERCLA. 40 C.F.R. § 300.68(d) (1986). The RI/FS is required "to determine the nature and extent of the threat presented by the release and to evaluate proposed remedies" and includes "sampling, monitoring, and exposure assessment, as necessary, and includes the gathering of sufficient information to determine the necessity for and proposed extent of remedial action." *Id.* This planning "shall, as appropriate, also assess the need for removals." *Id.*

Sections 300.68(e) through 300.68(i) describe the RI/FS process. During the RI phase, "scoping" of possible response actions is required to "indicate the extent to which the release or threat of release may pose a threat to public health or welfare or the environment, indicate the types of removal measures and/or remedial measures suitable to abate the threat, and set priori-

---

**45.** For example, section 300.68 of the 1982 NCP mandates a remedial alternative selection process that parallels closely the Remedial Investigation/Feasibility Study process contained in the 1985 NCP. *Compare* 40 C.F.R. §§ 300.68(f)-(j) (1985) *with* 40 C.F.R. §§ 300.68(d)-(i) (1986). To fulfill these requirements, Artesian proffers the "Water 2000" report, which was completed in June 1984, almost two years after publication

of the 1982 NCP. *See* Dkt. 174A, Ex. K. As will be discussed *infra,* this document does not attempt either "to determine the nature and extent of the problem presented by the release" or "to determine the necessity for and proposed extent of remedial action," 40 C.F.R. § 300.68(f) (1985), and is thus inconsistent with either version of the NCP.

ties for implementation of the measures." *Id.* § 300.68(e)(1). The RI must take account of a range of technical factors. *Id.* § 300.68(e)(2). During the FS phase, at least one remedial alternative is developed in each of five listed categories of alternatives. *Id.* § 300.68(f). Section 300.68(g) requires the FS to screen these alternatives on the basis of three broad criteria: cost, acceptable engineering practices, and effectiveness. *Id.* § 300.68(g). The remedial alternatives surviving this initial screening are subjected to a more detailed evaluation. *Id.* § 300.68(h)(1). The detailed analysis includes refinement and specification of the alternatives, detailed cost estimation, engineering evaluation, assessment of the effectiveness of each alternative, analysis of possible advanced or innovative technologies, and analysis of any adverse environmental impacts. *Id.* § 300.68(h)(2).

After completion of the RI/FS, section 300.68(i) requires

> selection of a cost-effective remedial alternative that effectively mitigates and minimizes threats to and provides adequate protection of public health and welfare and the environment.... [T]his will require selection of a remedy that attains or exceeds applicable or relevant and appropriate Federal public health and environmental requirements that have been identified for the specific site.

*Id.* § 300.68(i)(1). The requirement that the selected remedy attain federal public health and environmental standards is dispensed with in certain circumstances. *Id.* § 300.68(i)(5).

Although the activities specified in section 300.68 all refer to the responsibilities of the "lead agency," they are also applicable to private parties. *See id.* § 300.71(a)(3). Section 300.71 provides that remedial action by a private party will be consistent with the NCP if, *inter alia*, it "[p]rovides for appropriate site investigation and analysis of remedial alternatives as required under § 300.68" and "[c]omplies with the provisions of paragraphs (e) through (i) of § 300.68." *Id.* §§ 300.71(a)(2)(ii)(A)–(B).

To fulfill the RI/FS requirement, Artesian relies on the "Water 2000" report prepared by the Water Resources Agency for New Castle County, an entity unaffiliated with the County government. *See* Dkt. 175, Ex. G, Att. A. According to the report,

> "WATER 2000" is a Comprehensive Water Resources Management Plan which attempts to anticipate and prepare for the future potable water needs of New Castle County. The overall goal of "WATER 2000" is to achieve and maintain a balance between water resources and water use while minimizing costs to the public and conflicts with other community goals.

*Id.* at 1. The report endorsed as part of its development plan the construction of an interconnection between Artesian's water system and the Chester Water Authority. *Id.* at 74–75. Whatever else the Water 2000 report may be, however, it clearly is not the evaluation of alternatives for remedying releases of hazardous substances contemplated by the NCP. The affidavit of the administrator of the Water Resources Agency states:

> The "Water 2000" Plan is intended to address the future potable water needs of New Castle County. At no time, whether during preparation of the plan or at public meetings held to review the plan's recommendations, were any of the water supply options considered specifically from the standpoint of providing a replacement for contaminated groundwater. Likewise, removal or remedial actions pursuant to the Comprehensive Environmental Response, Compensation and Liability Act were never presented or discussed in the context of the development and public review of the "Water 2000" plan.

Affidavit of Bernard L. Dworsky, Dkt. 174A, Ex. F, at ¶ 11. Indeed, the report nowhere even refers to the Site or to a threat of contamination from the Site.

■ The Court assumes, without deciding, that instead of the Water 2000 report Artesian may fulfill the RI requirement by relying on studies, undertaken by others,

that specifically address the nature and extent of the release from the Site. Artesian thus need comply only with the FS requirement, without undertaking another, possibly redundant RI. Nevertheless, any document purporting to comply with the FS requirement must evaluate alternatives for remedying a release of hazardous substances, and this the Water 2000 report utterly fails to do.

Artesian suggests that because section 300.71(a)(2)(ii)(B) of the NCP does not specifically require a private party to comply with section 300.68(d), the Water 2000 report may serve as a "substitute" for the detailed, site-specific RI/FS the NCP requires of a lead agency. This conclusion is untenable. Section 300.71(a)(2)(ii)(B) expressly mandates private party compliance with sections 300.68(e) through 300.68(i), throughout which sections the RI/FS process introduced in section 300.68(d) is referenced. The Water 2000 report cannot achieve compliance with sections 300.68(e) through 300.68(i) without meeting the basic goal of section 300.68(d)—"to determine the nature and extent of the threat presented by the release and to evaluate proposed remedies." 40 C.F.R. § 300.68(d) (1986). The uncontradicted evidence in the record establishes beyond dispute that the Water 2000 report is inconsistent with this requirement of the NCP.

### b. Compliance With Other Laws

Under the 1985 NCP, it is the EPA's policy "to attain or exceed applicable or relevant and appropriate Federal [environmental and public health] requirements during remedial and removal actions." 50 Fed.Reg. 47917 (Nov. 20, 1985); see 40 C.F.R. §§ 300.65(f), 300.68(e)-(i) (1986). Following this policy, section 300.71(a)(4) requires private party responses to "comply with all otherwise legally applicable or relevant and appropriate Federal, State, and local requirements, including permit requirements." 40 C.F.R. § 300.71(a)(4) (1986). In its preamble to the 1985 NCP, the EPA explained that the requirement of compliance with other laws was intended in part as a substitute for a requirement that private response actions receive prior governmental approval:

> Another of the commenters recommended prior approval for private responses at NPL [National Priorities List] sites because of a concern that private parties and government may take independent responses at the same site and both seek cost recovery under CERCLA Section 107.... EPA believes that the requirement that private party responses comply with all applicable Federal, State, and local requirements, including permit requirements, as appropriate, is sufficient to deter poorly planned cleanup proposals and minimize the possibility of independent private party and government responses.

50 Fed.Reg. 47934 (Nov. 20, 1985). In cases of groundwater contamination, the applicable or relevant federal environmental and public health laws are the Safe Drinking Water Act ("SDWA"), 42 U.S.C. §§ 300f et seq., and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 et seq. See 50 Fed.Reg. 47922 (Nov. 20, 1985).

To be consistent with the NCP, a private party response must therefore bring conditions at the toxic waste site into compliance with applicable environmental and public health requirements. For example, a response to contaminated groundwater generally would be required to achieve a level of pollutants less than the maximum drinking water contaminant levels established under SDWA, 40 C.F.R. §§ 141.11–141.16 (1986), or the groundwater concentration limits established under RCRA, id. § 264.94. See 50 Fed.Reg. 47922 (Nov. 20, 1985). Artesian's planned provision of alternative water supplies, however, indisputably does not contribute to a reduction in the level of pollutants either in tap water or in the aquifer. This is in part because the County's groundwater recovery program has already been effective in eliminating the threat of contamination from the Site. See EPA Record of Decision, Dkt. 185, Ex. B, at 8; Apgar Affidavit, Dkt. 169, Ex. A, at ¶ 23.

In contrast, the EPA has determined that its selected remedy for the Site, consisting of landfill capping and continued groundwater recovery, results in the attainment of all applicable and relevant public health and environmental standards. *See* Record of Decision, Dkt. 185, Ex. B, at 22. The potential for independent private party and government responses is apparent in this context. Unless consistency with the NCP requires Artesian's response to achieve compliance with other laws in addition to that achieved by the EPA's response, Artesian and the EPA "may take independent responses at the same site and both seek cost recovery under CERCLA section 107." 50 Fed.Reg. 47934 (Nov. 20, 1985). For this reason, the Court finds Artesian's response to be inconsistent with section 300.71(a)(4) of the NCP.

### c. Public Comment Period

Section 300.67(d) of the NCP provides:

> In remedial actions at NPL sites ... feasibility studies that outline alternative remedial measures must be provided to the public for review and comment for a period of not less than 21 calendar days. Such review and comment shall precede selection of the remedial response. Public meeting(s) shall, in most circumstances, be held during the comment period.

40 C.F.R. § 300.67(d) (1986). Section 300.71(a)(2)(ii)(D) requires private parties to provide "an opportunity for appropriate public comment concerning the selection of a remedial action consistent with" section 300.67(d). *Id.* § 300.71(a)(2)(ii)(D).

The County asserts Artesian's proffered Feasibility Study, the Water 2000 report, was not made available for public comment. Artesian answers that the report was the subject of two public meetings and a public hearing. Given the finding that the Water 2000 report is not a Feasibility Study within the meaning of the NCP in the first instance, however, the Court need not resolve the parties' factual dispute. Public comment on a document that does not determine the nature and extent of a hazardous release or evaluate proposed remedies is not consistent with section 300.67(d).

### d. Cost-effectiveness

Section 105 of CERCLA provides that the NCP shall include "means of assuring that remedial action measures are cost-effective over the period of potential exposure to the hazardous substances or contaminated materials." 42 U.S.C. § 9605(7). In accordance with this mandate, section 300.71(a)(2)(ii)(C) requires private party remedial actions to be cost-effective. 40 C.F.R. § 300.71(a)(2)(ii)(C); *see id.* § 300.68(i)(1) (lead agency shall select cost-effective remedial alternative).

The County argues Artesian has made no showing that the proposed interconnection with the Chester Water Authority is a cost-effective response to the release of hazardous substances from the Site. Artesian replies that the Water 2000 report showed the interconnection to be the most cost-effective of the major water supply projects evaluated. This answer misses the point. The NCP requires not that the interconnection be cost-effective relative to other means of securing water supplies, but that the provision of water supplies be cost-effective relative to other means of remedying the contamination from the Site. As previously noted, the Water 2000 report does not even attempt such a showing. The Court finds Artesian's response to be inconsistent with section 300.71(a)(2)(ii)(C) of the NCP.

### G. Defenses

CERCLA establishes three affirmative defenses to liability for the release of hazardous substances. Section 107(b) provides that a defendant may prove by a preponderance of the evidence that the release or threatened release was caused solely by (1) an act of God; (2) an act of war; or (3) an act or omission of a third party unrelated to the defendant. 42 U.S.C. §§ 9607(b)(1)–(3). The County does not raise any of these defenses except insofar as they relate to the asserted lack of causal connection between the release of hazardous substances from the Site and the incurrence of costs by Artesian. The Court has previously found that the release from the Site was

the cause in fact of Artesian's costs.[46] Artesian has therefore established, for purposes of its motion for partial summary judgment, that there is no genuine issue of fact as to the nonexistence of a section 107(b) defense.

## IV. ELECTION OF REMEDIES

On the day before it commenced its private action under section 107, Artesian presented a claim for payment out of the Superfund pursuant to sections 111 and 112 of CERCLA, 42 U.S.C. §§ 9611–9612. Section 112(a) provides:

> All claims which may be asserted against the Fund pursuant to section 9611 of this title shall be presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the claimant who may be liable under section 9607 of this title. In any case where the claim has not been satisfied within sixty days of presentation in accordance with this subsection, the claimant may elect to commence an action in court against such owner, operator, guarantor, or other person or to present the claim to the Fund for payment.

CERCLA § 112(a), 42 U.S.C. § 9612(a). Based on the second sentence of section 112(a), the County argues that Artesian has made a binding election to pursue its remedy through the Superfund and that its section 107 claim must be dismissed.

In *Colorado v. Asarco, Inc.*, 616 F.Supp. 822 (D.Colo.1985), the court rejected a similar argument where the plaintiff had presented its Superfund claim the day after it filed its section 107 suit. The court believed that the language of section 112(a) suggests an irrevocable election of remedies, but noted that the EPA had rejected the plaintiff's claim against the Superfund. *Id.* at 828. Thus, the court determined that the defendant would not be prejudiced by

nor had it relied upon the filing of the Superfund claim, and accordingly denied a motion to dismiss. *Id.*

The County asserts that because Artesian's claim against the Superfund has not been rejected, the potential for prejudice still exists in this case.[47] The Court notes, however, that new evidence of congressional intent indicates that section 112(a) was never meant to impose a binding election of remedies. The recent amendments to CERCLA replace the second sentence of section 112(a) with the following language:

> In any case where the claim has not been satisfied within 60 days of presentation in accordance with this subsection, the claimant may present the claim to the Fund for payment. No claim against the Fund may be approved or certified during the pendency of an action by the claimant in court to recover costs which are the subject of the claim.

Superfund Amendments and Authorization Act of 1986, Pub.L. No. 99–499, § 112(a), 100 Stat. 1613, 1646 (to be codified at 42 U.S.C. § 9612(a)). The statute no longer can be said to suggest that a pending Superfund claim bars an action under section 107. In addition, the conference report on the 1986 amendments clarified existing law: "The sixty-day presentation requirement has never applied to civil actions, nor is the selection of remedies authorized in section 112(a) irrevocable." H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 219 (1986); *cf. Dedham Water Co. v. Cumberland Farms Dairy*, 805 F.2d 1074, 1081 (1st Cir.1986) (construing the sixty-day presentation requirement of section 112(a) in light of the 1986 amendments).

Although it is not dispositive, this legislative hindsight accords with the original language of section 112(a), which provides only that a claimant "may" elect to pursue one or the other remedy, not that such an election, once made, is binding. Moreover,

---

**46.** For a discussion of the County's causation argument, *see* text accompanying notes 22–25 *supra.*

**47.** The EPA has determined that Artesian's Superfund claim should be held in abeyance pending the EPA's selection of a remedial alternative for the Site. *See* Letter from Lee M. Thomas, Dkt. 174A, Ex. C. The claim is still pending.

it is difficult to see how the County is prejudiced by Artesian's pending Superfund claim, other than by having to participate in two sets of proceedings. If the claim is approved, the federal government will acquire by subrogation Artesian's rights against the County. *See* CERCLA § 112(c)(1), 42 U.S.C. § 9612(c)(1). If Artesian prevails in its section 107 action, it is precluded from recovering the same compensation from the Superfund. *Id.* § 114(b), 42 U.S.C. § 9614(b). The County therefore need not fear being subject to two judgments. Finally, the County has not shown any detrimental change in position made in reliance upon Artesian's Superfund filing. *See Asarco,* 616 F.Supp. at 828. In light of the foregoing, the Court holds that section 112(a) does not bar Artesian's action against the County.

## V. SUMMARY

For the foregoing reasons, the Court finds that no genuine issues of material fact exist as to the following:

(1) The County is a covered person under section 107(a) of CERCLA.

(2) There has been a release or threatened release of hazardous substances from the Site.

(3) The release or threatened release caused Artesian to incur costs.

(4) Artesian's monitoring and evaluation expenses, but not its other costs, are necessary costs of response.

(5) Artesian's monitoring and evaluation expenses, but not its other costs, were incurred consistent with the National Contingency Plan.

(6) The County has no defense under section 107(b) of CERCLA.

In addition, the Court holds that section 112(a) of CERCLA does not bar this action.

The County's motion to dismiss Artesian's amended complaint or, in the alternative, for summary judgment will be denied and Artesian's motion for partial summary judgment on liability will be granted, but only with respect to Artesian's claim for recovery of its monitoring and evaluation expenses. In all other respects, the County's motion will be granted and Artesian's motion will be denied.

## VI. CONCLUSION

Although this opinion disposes of many issues, because of the procedural posture of this case it leaves undetermined the amount of monitoring and evaluation expenses Artesian may recover. As a consequence, the case is not now poised for an appeal. Because this action is based upon a single claim for relief, a determination and direction of final judgment under Fed. R.Civ.P. 54(b) would be improper. *See Liberty Mutual Ins. Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976). Nor does the Court believe that certification of its interlocutory order for appeal would materially advance the ultimate termination of this litigation. *See* 28 U.S.C. § 1292(b). The parties are left either to litigate the amount of monitoring and evaluation expenses or to stipulate to an amount so that a final judgment may be entered in the interest of expediting an appeal.

I am aware the result in this case presents a superficial anomaly: the County, responsible for a release of hazardous substances that causes Artesian to suffer significant economic losses, nevertheless is not required to pay full compensation. This outcome, however, amply demonstrates the difference between an action for response costs under CERCLA and an action for damages in tort. Limiting recovery of the costs of providing alternative water supplies to cases of actual or threatened contamination of the existing water supply ensures that responsible parties will be liable under CERCLA only for necessary costs of response. Permitting recovery in any other circumstances would invite suits for a broad range of economic losses and ultimately transform CERCLA into a toxic tort statute. Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions. Unless Congress sees fit to provide such a remedy, full compensation for haz-

ardous waste harms will in most instances remain the province of state law.